**In re ARCTIC LEATHER GARMENT CO.**
**ROBERTSON v. BERGER.**
No. 384.

Circuit Court of Appeals, Second Circuit.

May 10, 1937.

Max Rothenberg, of New York City (David Haar, of New York City, of counsel), for appellant.

Benjamin Siegel, of New York City (Benjamin Brownstein, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

PER CURIAM.

This appeal is from an order entered upon the report of a special master, di-

recting the respondent—the debtor's president—to surrender to the trustee in reorganization certain books and papers alleged to be within his possession or control. The order included four books and the working sheets used to make up the debtor's inventory at the end of the year. The four books were as follows: (1) A "payroll book" containing the names and addresses of the debtor's employees, and what they got; (2) a "cutting book," the record of cloth delivered to workmen to be cut up into garments; (3) a "shipping book," showing all made-up garments shipped out of the factory; (4) a "garment book," showing the garments made up. It is the trustee's theory that all these were kept in the factory in New Jersey and were on the premises after the petition was filed, January 9, 1936, and until just before the trustee took possession, January 19th, when the respondent, the debtor's president, Berger, carried them off, either personally, or by means of the treasurer, Sussmann, who has disappeared, and who, besides Berger, was the debtor's only shareholder and officer. The existence of the "payroll book" was proved by the testimony of the watchman of the factory, the bookkeeper, and an employee of the "carrier" of workmen's compensation. All agreed that it contained the names and addresses of the workmen, though the bookkeeper said that it did not show their wages. The "cutting book" was to check the cloth delivered to the workmen; it consisted of a series of slips with counterfoils, the slips to be torn out and given to the workmen when cloth was delivered, the record remaining on the counterfoils. It was seen by the watchman and a cutter whose wages depended upon its entries. The "shipping book" was also in foil and counterfoil, it represented the finished garments which left the factory; a foil out of this book was in evidence and the watchman testified to the existence of the book, though the shipping clerk said that there was no book, but that an original went to each customer and merely the counterfoil to the New York office. The "garment book" as a separate book from the "cutting-book" is not satisfactorily shown to have existed, and indeed the master seems to have been in doubt whether there was any. We share that doubt; taking the record as a whole, we cannot find evidence of more than the existence of the three books, which the watchman called the "Ledger," the "Composition Book," and the "Shipping Book." We will therefore reverse the order so far as it directed the surrender of the book therein numbered 7.

As to the three books, the defense is that they were not traced to the respondent's possession, and that the master did not find that the respondent could deliver them if ordered. It is true that there was not such formal finding; the report merely said that "the records were proved to be in existence at or about the time of the commencement of these proceedings and that their turnover by the respondents should be directed." These proceedings were begun on February 21, 1936, about six weeks after petition filed —unless the referee was speaking of the reorganization proceedings themselves. Be that as it may, the important thing is whether the respondent could comply when the order was made; and, while it must be owned that the imprecision of the report is unsatisfactory, the master could not have supposed the respondent to be subject to the order unless he could comply with it. It would be a futility to return the cause for the correction of what we can see to be a merely formal omission. Moreover, this implied finding, which we discover in the report as it reads, seems to us to be supported by the testimony. Once granted that the three books existed and were in the debtor's New Jersey factory on petition filed, and until the very eve of the trustee's possession—and not thereafter, as the respondent wishes us to believe—we cannot understand who else but Berger and Sussmann could have made off with them. The inference is immensely stronger than when money is in dispute, for books are absolutely useless to any one but the bankrupt and may be vitally important to him. Unless they have been lost through negligence, either he must have them, or else he has deliberately destroyed them. Thus, upon satisfying the judge that they were at hand until just before a trustee or receiver took possession, no conclusion is reasonably possible but that he took them. True, he may later have destroyed them, but that he must prove. Bankrupts have, not unnaturally, never been willing to acknowledge the force of this

reasoning, but the fact remains that the only real dispute open in such a situation is whether the books ever existed, and whether they may have been innocently lost or destroyed. The conditions laid down in Oriel v. Russell, 278 U.S. 358, 364, 49 S.Ct. 173, 174, 73 L.Ed. 419, are abundantly fulfilled, when those issues are answered. The order at bar will therefore be affirmed as to the items therein numbered 1, 2, and 3, and reversed as to 7.

There remains the question of the inventory sheets. Berger had been called upon to make a financial statement for the debtor about a year before petition filed; one of the questions asked in it was: "Do you retain your inventory records permanently, and if so, in what form?" He answered: "Loose leaf form." Upon the trial it appeared that he had taken an inventory in December, 1934, and in December, 1935, as is the almost universal custom. This was done by writing down the different items upon loose sheets of paper, used as working sheets. All the testimony is that these sheets were not preserved, and there was not the least reason why they should have been. The details were probably not very important; it is the footing which mostly matters in stating the accounts. It is true that the financial statement was false; but it was false on any theory, for rough working sheets are in no sense an inventory in "loose leaf form." We are not concerned to defend the veracity of the respondent which our affirmance of any part of the order inevitably discredits; indeed, the fact that his testimony was certainly false upon the stand tends to confirm our belief that the financial statement was also false. We do not believe that the sheets were ever kept after the footings were entered in the permanent books, and we are entirely clear that there never were any "loose leaf forms." Moreover, even though we may not have the basis for a negative finding, there was certainly only the weakest support for an affirmative one, too little to justify the commitment which will almost automatically follow noncompliance.

Order affirmed as to items 1, 2, and 3; order reversed as to items 5 and 7.