## UNITED STATES *v.* WHITE.

No. 366. Argued March 6, 1944.—Decided June 12, 1944.

*Assistant Attorney General Tom C. Clark,* with whom *Solicitor General Fahy,* and *Messrs. Chester T. Lane, Philip Marcus, Jesse Climenko, Malcolm A. Hoffman,* and *George M. Fay* were on the brief, for the United States.

*Mr. Robert J. Fitzsimmons* for respondent.

Mr. Justice Murphy delivered the opinion of the Court.

During the course of a grand jury investigation into alleged irregularities in the construction of the Mechanicsburg Naval Supply Depot, the District Court of the United States for the Middle District of Pennsylvania issued a subpoena duces tecum directed to "Local No. 542, International Union of Operating Engineers." This subpoena required the union to produce before the grand jury on January 11, 1943, copies of its constitution and by-laws and specifically enumerated union records showing its collections of work-permit fees, including the amounts paid therefor and the identity of the payors from January 1, 1942, to the date of the issuance of the subpoena, December 28, 1942.

The United States marshal served the subpoena on the president of the union. On January 11, 1943, respondent appeared before the grand jury, describing himself as "assistant supervisor" of the union. Although he was not shown to be the authorized custodian of the union's books, he had the demanded documents in his possession. He

had not been subpoenaed personally to testify nor personally directed by the subpoena duces tecum to produce the union's records. Moreover, there was no effort or indicated intention to examine him personally as a witness. Nevertheless he declined to produce the demanded documents "upon the ground that they might tend to incriminate Local Union 542, International Union of Operating Engineers, myself as an officer thereof, or individually." He reiterated his refusal after consulting counsel.

He was immediately cited for contempt of court and during the hearing on the contempt repeated his refusal once again. He based his refusal on the opinion of his counsel that "great uncertainty exists today as to what may or may not constitute a violation of Section 276 (b), Title 40, of the United States Code." [1] He made no effort, although he apparently was willing, to tender the records for the judge's inspection in support of his assertion that their contents would tend to incriminate him or the union. The District Court held his refusal inexcusable, adjudged him guilty of contempt of court and sentenced him to thirty days in prison.

The court below reversed the District Court's judgment by a divided vote. 137 F. 2d 24. The majority held that the records of an unincorporated labor union were the property of all its members and that, if respondent were a

---

[1] This was a reference to the so-called "Kickback" Act, which was before us in *United States* v. *Laudani,* 320 U. S. 543. Section 1 of the Act provides that whoever shall induce any person employed in the construction, prosecution or completion of any public building or work financed in whole or in part by the United States, or in the repair thereof, to give up part of his compensation by force, intimidation, threat of procuring dismissal from employment, or by any other manner whatsoever shall be fined not more than $5,000, or imprisoned not more than five years, or both. Act of June 13, 1934, c. 482, 48 Stat. 948, 40 U. S. C. § 276 (b).

union member and if the books and records would have tended to incriminate him, he properly could refuse to produce them before the grand jury. The court below accordingly remanded the case to the District Court with directions to sustain the claim of privilege if after further inquiry it should determine that respondent was in fact a member of the union and that the documents would tend to incriminate him as an individual. We granted certiorari, 320 U. S. 729, because of the novel and important question of constitutional law which is presented.[2]

The only issue in this case relates to the nature and scope of the constitutional privilege against self-incrimination. We are not concerned here with a complete delineation of the legal status of unincorporated labor unions. We express no opinion as to the legality or desirability of incorporating such unions or as to the necessity of considering them as separate entities apart from their members for purposes other than the one posed by the narrow issue in this case. Nor do we question the obvious fact that business corporations, by virtue of their creation by the state and because of the nature and purpose of their activities, differ in many significant respects from unions, religious bodies, trade associations, social clubs and other types of organizations, and accordingly owe different obligations to the federal and state gov-

---

[2] In its petition for a writ of certiorari in this case, the Government claimed that respondent had taken his appeal to the Circuit Court of Appeals by filing a notice of appeal pursuant to the Criminal Appeals Rules rather than by application for appeal as required by § 8 (c) of the Act of February 13, 1925, c. 229, 43 Stat. 940, 28 U. S. C. § 230. See *Nye* v. *United States*, 313 U. S. 33, 43–44. It appears, however, that at the contempt hearing an extensive colloquy took place between the district judge and counsel with respect to the perfecting of the appeal and respondent at that time made in effect an oral application for appeal which was allowed by the court within the meaning of the Act of February 13, 1925.

ernments. Our attention is directed solely to the right of an officer of a union to claim the privilege against self-incrimination under the circumstances here presented.

Respondent contends that an officer of an unincorporated labor union possesses a constitutional right to refuse to produce, in compliance with a subpoena duces tecum, records of the union which are in his custody and which might tend to incriminate him. He relies upon the "unreasonable search and seizure" clause of the Fourth Amendment and the explicit guarantee of the Fifth Amendment that no person shall be compelled in any criminal case to be a witness against himself. We hold, however, that neither the Fourth nor the Fifth Amendment, both of which are directed primarily to the protection of individual and personal rights, requires the recognition of a privilege against self-incrimination under the circumstances of this case.

. The constitutional privilege against self-incrimination is essentially a personal one, applying only to natural individuals. It grows out of the high sentiment and regard of our jurisprudence for conducting criminal trials and investigatory proceedings upon a plane of dignity, humanity and impartiality. It is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him. Physical torture and other less violent but equally reprehensible modes of compelling the production of incriminating evidence are thereby avoided. The prosecutors are forced to search for independent evidence instead of relying upon proof extracted from individuals by force of law. The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime. While the privilege is subject to abuse and mis-

use, it is firmly embedded in our constitutional and legal frameworks as a bulwark against iniquitous methods of prosecution. It protects the individual from any disclosure, in the form of oral testimony, documents or chattels, sought by legal process against him as a witness.

Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation. *Hale* v. *Henkel,* 201 U. S. 43; *Wilson* v. *United States,* 221 U. S. 361; *Essgee Co.* v. *United States,* 262 U. S. 151. See also *United States* v. *Invader Oil Corp.,* 5 F. 2d 715. Moreover, the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity. *Boyd* v. *United States,* 116 U. S. 616. But individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations. In their official capacity, therefore, they have no privilege against self-incrimination. And the official records and documents of the organization that are held by them in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally. *Wilson* v. *United States, supra; Dreier* v. *United States,* 221 U. S. 394; *Baltimore & Ohio R. Co.* v. *Interstate Commerce Commission,* 221 U. S. 612; *Wheeler* v. *United States,* 226 U. S. 478; *Grant* v. *United States,* 227 U. S. 74; *Essgee Co.* v. *United States, supra.* Such records and papers are not the private records of the individual members or officers of the organization. Usually, if not always, they are open to inspection by the members and this right may be enforced on ap-

propriate occasions by available legal procedures. See *Guthrie* v. *Harkness*, 199 U. S. 148, 153. They therefore embody no element of personal privacy and carry with them no claim of personal privilege.

The reason underlying the restriction of this constitutional privilege to natural individuals acting in their own private capacity is clear. The scope and nature of the economic activities of incorporated and unincorporated organizations and their representatives demand that the constitutional power of the federal and state governments to regulate those activities be correspondingly effective. The greater portion of evidence of wrongdoing by an organization or its representatives is usually to be found in the official records and documents of that organization. Were the cloak of the privilege to be thrown around these impersonal records and documents, effective enforcement of many federal and state laws would be impossible. See *Hale* v. *Henkel, supra,* 70, 74; 8 Wigmore on Evidence (3d ed.) § 2259a. The framers of the constitutional guarantee against compulsory self-disclosure, who were interested primarily in protecting individual civil liberties, cannot be said to have intended the privilege to be available to protect economic or other interests of such organizations so as to nullify appropriate governmental regulations.

The fact that the state charters corporations and has visitorial powers over them provides a convenient vehicle for justification of governmental investigation of corporate books and records. *Hale* v. *Henkel, supra; Wilson* v. *United States, supra.* But the absence of that fact as to a particular type of organization does not lessen the public necessity for making reasonable regulations of its activities effective, nor does it confer upon such an organization the purely personal privilege against self-incrimination. Basically, the power to compel the production of the records of any organization, whether it be incor-

porated or not, arises out of the inherent and necessary power of the federal and state governments to enforce their laws, with the privilege against self-incrimination being limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records.

It follows that labor unions, as well as their officers and agents acting in their official capacity, cannot invoke this personal privilege. This conclusion is not reached by any mechanical comparison of unions with corporations or with other entities nor by any determination of whether unions technically may be regarded as legal personalities for any or all purposes. The test, rather, is whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only. If so, the privilege cannot be invoked on behalf of the organization or its representatives in their official capacity. Labor unions—national or local, incorporated or unincorporated—clearly meet that test.

Structurally and functionally, a labor union is an institution which involves more than the private or personal interests of its members. It represents organized, institutional activity as contrasted with wholly individual activity. This difference is as well defined as that existing between individual members of the union. The union's existence in fact, and for some purposes in law, is as perpetual as that of any corporation, not being dependent upon the life of any member. It normally operates under its own constitution, rules and by-laws which, in controversies between member and union, are often enforced by the courts. The union engages in a multitude of business and other official concerted activities, none of which

can be said to be the private undertakings of the members.[3] Duly elected union officers have no authority to do or sanction anything other than that which the union may lawfully do; nor have they authority to act for the members in matters affecting only the individual rights of such members. The union owns separate real and personal property, even though the title may nominally be in the names of its members or trustees.[4] The official union books and records are distinct from the personal books and records of the individuals, in the same manner as the union treasury exists apart from the private and personal funds of the members. See *United States* v. *B. Goedde & Co.*, 40 F. Supp. 523, 534. And no member or officer has the right to use them for criminal purposes or for his purely private affairs. The actions of one individual member no more bind the union than they bind another individual member unless there is proof that the union authorized or ratified the acts in question. At the same time, the members are not subject to either criminal or civil liability for the acts of the union or its officers as such unless it is shown that they personally authorized or participated in the particular acts. See *Lawlor* v.

---

[3] In *United Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344, 385, this Court described the union there involved in the following terms: "The membership of the union has reached 450,000. The dues received from them for the national and district organizations make a very large annual total, and the obligations assumed in travelling expenses, holding of conventions, and general overhead cost, but most of all in strikes, are so heavy that an extensive financial business is carried on, money is borrowed, notes are given to banks, and in every way the union acts as a business entity, distinct from its members. No organized corporation has greater unity of action, and in none is more power centered in the governing executive bodies."

[4] Lloyd, The Law Relating to Unincorporated Associations (1938) 165 ff.; Wrightington, The Law of Unincorporated Associations (2d ed. 1923) 336 ff.

*Loewe*, 235 U. S. 522; *Eagle Glass & Mfg. Co.* v. *Rowe*, 245 U. S. 275.

Moreover, this Court in *United Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344, held that labor unions might be made parties defendant in suits for damages under the Sherman Act by service of process on their officers.

Both common law rules and legislative enactments have granted many substantive rights to labor unions as separate functioning institutions. In *United Mine Workers* v. *Coronado Coal Co.*, *supra*, 385–386, this Court pointed out that "the growth and necessities of these great labor organizations have brought affirmative legal recognition of their existence and usefulness and provisions for their protection, which their members have found necessary. Their right to maintain strikes, when they do not violate law or the rights of others, has been declared. The embezzlement of funds by their officers has been especially denounced as a crime. The so-called union label, which is a quasi trademark to indicate the origin of manufactured product in union labor, has been protected against pirating and deceptive use by the statutes of most of the states, and in many states authority to sue to enjoin its use has been conferred on unions. They have been given distinct and separate representation and the right to appear to represent union interests in statutory arbitrations, and before official labor boards." Even greater substantive rights have been granted labor unions by federal and state legislation subsequent to the statutes enumerated in the opinion in that case.[5]

---

[5] Outstanding examples of federal legislation enacted subsequent to the *Coronado* case giving recognition to union personality are the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. § 151, the Railway Labor Act, 44 Stat. 577, 45 U. S. C. § 151, and the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 101. The Anti-Racketeering Act, 48 Stat. 979, 18 U. S. C. § 420a–e, excepts certain types of

These various considerations compel the conclusion that respondent could not claim the personal privilege against self-incrimination under these circumstances. The subpoena duces tecum was directed to the union and demanded the production only of its official documents and records. Respondent could not claim the privilege on behalf of the union because the union did not itself possess such a privilege. Moreover, the privilege is personal to the individual called as a witness, making it impossible for him to set up the privilege of a third person as an excuse for a refusal to answer or to produce documents. Hence respondent could not rely upon any possible privilege that the union might have. *Hale* v. *Henkel, supra,* 69–70; *McAlister* v. *Henkel,* 201 U. S. 90. Nor could respondent claim the privilege on behalf of himself as an officer of the union or as an individual. The documents he sought to place under the protective shield of the privilege were official union documents held by him in his capacity as a representative of the union. No valid claim was made that any part of them constituted his own private papers. He thus could not object that the union's books and records might incriminate him as an officer or as an individual.

It is unnecessary to determine whether or not respondent was a member of the union in question, for in either event he could not invoke the privilege against self-incrimination under these facts. It is likewise immaterial whether the union was subject to the provisions of the statute in relation to which the grand jury was making

activity by labor unions, thereby recognizing them as entities capable of violating the Act. The War Labor Disputes Act, 57 Stat. 163, 50 U. S. C. App. § 1501, evidences a similar recognition. See, in general, 1 & 2 Teller, Labor Disputes and Collective Bargaining (1940), Part V. For references to and discussions of recent state labor legislation, see *id.,* Part VI; Smith and DeLancey, "The State Legislatures and Unionism," 38 Michigan Law Rev. 987.

its investigation. The exclusion of the union from the benefits of the purely personal privilege does not depend upon the nature of the particular investigation or proceeding. The union does not acquire the privilege by reason of the fact that it is not charged with a crime or that it may not be subject to liability under the statute in question. The union and its officers acting in their official capacity lack the privilege at all times of insulating the union's books and records against reasonable demands of governmental authorities.

The judgment of the court below must be reversed and that of the District Court affirmed.

*Reversed.*

MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON concur in the result.