In the Matter of the Application of William L. PATTERSON to Quash a subpoena Duces Tecum Issued by the Clerk of the United States District Court of the Southern District Upon the Request of the United States Attorney Directing Civil Rights Congress by William L. Patterson to Produce Before the U. S. Grand Jury of the Southern District Specified Records of Civil Rights Congress.

United States District Court
S. D. New York.
Nov. 19, 1954.

J. Edward Lumbard, U. S. Atty., New York City, Richard Owen, Asst. U. S. Atty., New York City, of counsel, for the United States.

Milton H. Friedman, New York City, for William L. Patterson.

WEINFELD, District Judge.

This is a motion pursuant to Rule 42 (b) of the Federal Rules of Criminal Procedure, 18 U.S.C., to adjudge a witness in criminal contempt for failure to produce certain records before a Grand Jury. The application originated in a presentment by the Grand Jury for an order directing the witness, William L. Patterson, as the Executive Secretary of the Civil Rights Congress, to produce its detailed record receipts for the years 1950 through 1953. A subpoena duces tecum which had been served upon him specifies that the records are sought in connection with a Grand Jury inquiry into an alleged violation of Title 26 U.S. C. § 145(a).

Upon his appearance before the Grand Jury in response to the subpoena, the witness failed to produce the records, stating he was without knowledge as to their present whereabouts or their existence; further, he refused to answer specific inquiries with respect to them, asserting his privilege against self-incrimination. Hearings were thereupon had before the Court at which the witness was represented by counsel. His refusal to answer in large part was based upon an order by Judge McGohey [1] adjudging him in contempt of Court and sentencing him to ninety days imprisonment following his failure to produce the same records (except those for the year 1953) before the Commissioner of Internal Revenue pursuant to a summons issued under Title 26 U.S.C. § 3614. He was confined from July 1st to September 27th. Shortly following his release the present Grand Jury subpoena duces tecum was served.

His basic contention was that answers to specific questions with respect to the location or the existence of the records prior to July 1, 1954, or the production

1. Matter of Civil Rights Congress (William L. Patterson), D.C., 124 F.Supp. 68.

at this time of the sought-for records, confronted him with the danger on the one hand of again being found in contempt of Court, or, on the other, of having perjured himself, or having violated 26 U.S.C. § 145(a).

During the progress of the hearings the Court sustained his refusal to answer questions put to him as an individual and which he declined to answer under the privilege against self-incrimination. In view of his testimony given before the agents of the Bureau of Internal Revenue and the statements in his affidavit submitted in the prior proceeding,[2] the answers to the questions propounded before the present Grand Jury might well serve as a link in the chain of evidence supporting either a perjury charge or a prosecution for violation of § 145(a) of Title 26.[3]

There remains, however, the issue of the production of the detailed record receipts of the Civil Rights Congress.[4]

██ The law is well settled that the privilege against self-incrimination under the Fifth Amendment is available only to natural persons and is unavailable to one in possession of papers or documents in a representative capacity, even though their production might tend to incriminate him personally.[5]

██ The witness contends that this rule does not extend to situations where, as here, the mere production of the sought-for documents, regardless of their contents,[6] may tend to incriminate. It is true that United States v. Field, 2 Cir., 193 F.2d 109, did not pass on this contention, but Mr. Justice Murphy in United States v. White, 322 U.S. 694, 64 S. Ct. 1248, 88 L.Ed. 1542, states the rule in terms that foreclose any contention that an exception exists where the production of documents, as distinguished from their contents, may tend to incriminate:

"[I]ndividuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations. In their official capacity, therefore, they have no privilege against self-incrimination. And the official records and documents of the organization that are held by them in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though *production* of the papers might tend to incriminate them personally." [7] (Emphasis supplied.)

Moreover, the considerations advanced in support of the denial of the privilege to those appearing in a representative capacity are as applicable to one situation as to the other. If the exception were allowed, a previous sworn denial of possession would insulate the records of associations from examination.

██ Thus the issue remains: Whether the records are in the possession of the witness or subject to his con-

2. 26 U.S.C. § 3633.

3. Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170; United States v. Hoffman, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118; In re Friedman, D.C.S.D. N.Y., 104 F.Supp. 419.

4. The witness originally sought to avoid appearance before the Grand Jury by a motion to quash, which was denied. He was directed to respond to the subpoena and if any questions so warranted, to assert his privilege before that body. As noted, the privilege has been upheld in his individual capacity.

5. United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542; Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344; United States v. Field, 2 Cir., 193 F.2d 109.

6. The witness asserted that to his knowledge nothing contained in the records would tend to incriminate him.

7. 322 U.S. 694, 699, 64 S.Ct. 1248, 1251; Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344.

884

trol or direction. And if so, has the witness wilfully and contumaciously failed to produce them? In determining this issue, it must, of course, be remembered that in a criminal contempt proceeding the burden is upon the government to prove its charges beyond a reasonable doubt.[8] And while "A court will not imprison a witnesss for failure to produce documents which he does not have",[9] the government may rely on an inference of present possession from facts proving past possession.[10] And we are reminded that the "process of drawing inferences is to be governed, as ordinarily, by human experience"[11] and that circumstantial evidence is on no different or lower plane than other forms of evidence.[12] Once the government with or without the aid of the inference has established a prima facie case, it is for the witness to go forward and show that the papers are not in his possession or control. And a mere categorical denial of knowledge of the whereabouts or existence of the records is certainly not conclusive, and may be insufficient to overcome the prima facie case,[13] particularly so where his credibility is impaired by prior contradictory statements. As the Supreme Court has pointed out, it is not incumbent on the prosecution to negative every possible excuse for non-action upon its mere assertion by the witness.[14]

■ Upon a careful review of the testimony, the exhibits received in evidence, including the testimony and Pat-

terson's affidavit submitted in the prior proceeding, and upon an appraisal of the witnesses who appeared before me, I am satisfied that the government has sustained its burden of proof but only as to some, but not all, of the records called for in the subpoena. True, there is no direct proof that they are in his immediate physical possession, but the record abundantly establishes that the 1953 and part of the 1952 receipt books, despite his assertions to the contrary, were in existence as of June 1954 and no evidence other than denials of knowledge of their whereabouts or existence has been presented to overcome the inference of continued existence.[15] As to the 1950 and 1951 records, the government has failed to sustain its burden.

At the outset, it should be noted that the witness, according to his own testimony, has an all-pervasive power with respect to the records of the Civil Rights Congress. He has been its principal executive officer from 1948 down to the present. His incarceration for the period of his contempt sentence did not alter or diminish his power or control. He describes himself alternatively as the "Executive Secretary," the "titular head," or the "senior executive" and appears to be the sole officer of the organization. He has had, and continues to have, full responsibility for all its books and records and his control is so complete that he has power to command any record in the possession of any of its chapters. Thus, we are not dealing with a

8. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 444, 31 S.Ct. 492, 55 L. Ed. 797; Clark v. United States, 8 Cir., 61 F.2d 695, 700–701; United States v. Hall, 2 Cir., 198 F.2d 726, 729; United States v. Dachis, D.C.S.D.N.Y., 36 F.2d 601, 603.

9. United States v. Bryan, 339 U.S. 323, 330–331, 70 S.Ct. 724, 730, 94 L.Ed. 884; United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906; Healey v. United States, 9 Cir., 186 F.2d 164; United States v. Goldstein, 2 Cir., 105 F.2d 150.

10. United States v. Goldstein, supra; In re Arctic Leather Garment Co., 2 Cir., 89 F.2d 871, 872.

11. United States v. Hall, 2 Cir., 198 F. 2d 726, 730.

12. United States v. Becker, 2 Cir., 62 F. 2d 1007; Lukon v. Pennsylvania R. Co., 3 Cir., 131 F.2d 327, 329.

13. United States v. Goldstein, 2 Cir., 105 F.2d 150. Cf. Dyer v. MacDougall, 2 Cir., 201 F.2d 265, 269.

14. United States v. Fleischman, 339 U.S. 349, 360–361, 70 S.Ct. 739, 94 L.Ed. 906; United States v. Bryan, 339 U.S. 323, 330, 70 S.Ct. 724, 94 L.Ed. 884; Rossi v. United States, 289 U.S. 89, 90–91, 53 S.Ct. 532, 77 L.Ed. 1051.

15. See footnote 10, supra.

case of divided responsibility [16] or of a person whose tenure of office is in issue.[17]

As pointed out by the government, Patterson from time to time has given varied and conflicting statements with respect to the records.[18] He has said that:

(a) he would not give them up;

(b) he was making listings from them;

(c) they were probably destroyed.

Finally, upon the hearings before me and in his testimony before the Grand Jury, he has disclaimed possession of the records, knowledge of their whereabouts or existence. He declined to answer questions concerning the existence, whereabouts, or disposition of the receipt books prior to July 1, 1954. As already noted, his refusal has been upheld as a personal privilege, and in reaching my conclusion that he has control of the records I have drawn no inference from such refusal.[19]

However, the witness stated that he had not seen the books since July 1954, thus bringing his last admitted contact with them down to the end of June of that year.[20] But far more important than this statement is a list prepared at the instance of the witness and submitted by him to the Internal Revenue Service on June 4, 1954.[21] This list or extract was compiled from books and records of the Civil Rights Congress. The extract, starting with receipt No. 6828,[22] dated January 2, 1953, and running in consecutive order thereafter, lists for each receipt number, the amount received, the date received, whether contribution or otherwise.[23]

The extract which omits the name of the contributor—part of the information sought—could only have been prepared from the final carbon copy of a receipt book. The evidence establishes that ten receipt books, each containing five hundred receipts, ten to a page, were prepared by a printer at the request of the Civil Rights Congress. The ten books, numbered consecutively, started with receipt number 3590. Each receipt was printed in triplicate and only the third sheet was unperforated. Receipt No. 6828, the first one listed in the summary extract, was contained in the middle of one of the ten receipt books, the opening number of which was 6590. Thus, this book contained two hundred thirty-eight receipts antecedent to the first one issued in 1953, and the inference is fully warranted that they were issued over a period of approximately six months in the year 1952.[24] The witness' affidavit of June 17, 1954, that the extract "was prepared, but instead of the year 1952, it was prepared from the receipt book of the year 1953," is demonstrably false since the book in question obviously included the two hundred thirty-eight receipts issued prior to January 2, 1953.

Nor is the witness' position improved by the alleged destruction on April 23, 1953 of seventeen cartons of undescribed stored papers. Since the extract was

---

16. United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906, see dissenting opinion of Mr. Justice Black, 339 U.S. at page 365, 70 S.Ct. at page 748.

17. Healey v. United States, 9 Cir., 186 F. 2d 164, 169.

18. Cf. United States v. Goldstein, 2 Cir., 105 F.2d 150.

19. United States ex rel. Belfrage v. Shaughnessy, D.C.S.D.N.Y., 113 F.Supp. 56, affirmed 2 Cir., 212 F.2d 128.

20. Although at another point in his testimony he sought to disavow this statement, there can be no doubt as to what he said. His own attorney in advancing an argument to the Court in support of his client's position, relied upon this statement. This statement is in conflict with his affidavit in the contempt proceeding before Judge McGohey.

21. Grand Jury Exhibits 4A, 4B, 4C, 4D.

22. Grand Jury Exhibit 4A.

23. The principal items receipted for were contributions.

24. The receipts subsequent to No. 6828 run consecutively to receipt No. 7089, a total of two hundred sixty-one, and extend from January 2, 1953 to July 6, 1953, a six months' period. Grand Jury Exhibits 4A, 4B, 4C, 4D.

prepared in May, 1954, and submitted on June 4, 1954, the records on which it was based were obviously in existence subsequent to the destruction of the seventeen cartons. Indeed, the proof on this issue was so compelling that counsel for the witness conceded it was "very persuasive to demonstrate that the 1953 records existed in June 1954. I am not prepared to show that those records, when or where those records were disposed of, or by whom they were disposed of." [25]

The record further convincingly establishes that this witness and those associated with him have pursued a determined policy to avoid the submission of any record containing information as to the identity of contributors. Thus, when the Internal Revenue Service initiated its inquiry in May of 1954, and a request was made for the pertinent records, the witness referred the investigator to a bookkeeper who bluntly stated that the records were available but would never be surrendered.[26] Thereafter, on two separate occasions, when the agent again demanded the records, pointing out that they were required for a proper audit, the witness acknowledged they were available but said he would never furnish a list of the contributors to the organization.[27] The records then under discussion were those of 1950, 1951 and 1952. In his affidavit opposing the earlier motion to punish him for contempt he stated that all books had been made available, except those containing the names of contributors, as to which he attacked the good faith of the Service in seeking them. Then, for the first time, he contended the records were unavailable. He attempted to overcome his earlier statements to the contrary by contending he had assumed that the receipt books were available but referring to the destruction in April 1954 of the seventeen cartons, the contents of which he never knew, he then "found that these books are not available."

Bearing in mind the conscious purpose to avoid disclosure of the names of contributors, which the witness reiterated at the hearing before me, there is strong motivation for their continued non-production.

In sum, the extract and other evidence overwhelmingly establish that the receipt books for the years 1952 and 1953 were in existence in June 1954 and in the possession or under the control of the witness. He retained his position while serving the ninety day sentence imposed by Judge McGohey. In the absence of proof or any attempt to prove that the records might have been disposed of or destroyed, the inference is fully warranted that the records existing in June remain in existence today. The bare assertion of the witness is insufficient to raise a reasonable doubt as to his present possession or control of these records, especially where his credibility is undermined by the several contradictory explanations he has offered for the non-production of the documents.

In effect, the witness contends that in addition to proving the existence of the records the government must also establish that they have not been destroyed— a defense which has been vaguely hinted at but as to which no proof was attempted. The government is only called upon to establish its prima facie case that the records are in the possession of or under the control of the witness. The burden of going forward has shifted to him and he has failed, by absence of proof and lack of credibility, to show they were destroyed or are unavailable for any other reason.

Thus, having been persuaded that the witness was able to comply in part with the terms of the subpoena, I directed him to reappear before the Grand Jury and to produce the receipt records for the years 1952 and 1953. He again failed to produce any records for those years or any part thereof reflecting the names

25. SM 62, 75, November 16, 1954.

26. SM 37–38, November 9, 1954.

27. SM 35, 42, November 9, 1954; Grand Jury Exhibit 1, Testimony of Patterson, taken May 27, 1954.

of contributors and reiterated his prior position. Thereupon a further hearing was had, at which the motion to adjudge him in contempt was made upon the entire record. In view of the witness' failure to produce the records as directed, and being satisfied of his ability to comply and that his action was wilful and contumacious, the motion is granted and the witness is committed to the custody of the Attorney General for a period of ninety days unless he shall sooner purge himself by producing the records or shall otherwise be discharged by law.