UNITED STATES of America,
Plaintiff-Appellee,

v.

William L. PATTERSON,
Defendant-Appellant.

No. 186, Docket 23389.

United States Court of Appeals,
Second Circuit.

Argued Jan. 12, 1955.

Decided Jan. 27, 1955.

Dissenting Opinion Jan. 31, 1955.

Richard Owen, Asst. U. S. Atty., New York City (J. Edward Lumbard, U. S. Atty., New York City, on the brief), for plaintiff-appellee.

Milton H. Friedman, New York City, for defendant-appellant.

Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.

CLARK, Chief Judge.

Defendant, William L. Patterson, has been convicted of criminal contempt for his failure to produce certain records demanded by a subpoena duces tecum issued by a duly authorized grand jury. The defendant concedes that any records of the Civil Rights Congress which presently exist are in his control as Executive Secretary of that organization. His main contention, also advanced below, but rejected by the district court, is that the government has not sustained its burden of proof that the records it demands are still in existence.

The present proceedings arise out of an investigation initiated by the Internal Revenue Department last spring to audit the books of the Civil Rights Congress. At that time Patterson had prepared detailed statements of 1953 income from the 1953 receipt books, but refused to submit the receipt books themselves which contained the names of contributors. This refusal, which concerned at that time only the 1950, 1951, and 1952 books, led to a ninety-day sentence for criminal contempt by Judge McGohey in June. Matter of Tax Liability of Civil Rights Congress for the years 1950, 1951 and 1952, D.C.S.D.N.Y., 124 F. Supp. 68. This sentence was served from July 1 to September 28, 1954. Immediately after release from prison, defendant was again asked for the receipt books, this time including the 1953 ones, by an Internal Revenue agent. Upon noncompliance the matter was referred to a grand jury for investigation of possible violation of I.R.C. § 145(a), 26

U.S.C. § 145(a), which provides penalties for failure to file tax returns, keep books, or supply information for federal tax purposes. Pursuant to a grand jury subpoena dated October 28, 1954, testimony was taken on November 5, 9, and 16, 1954. At that time the defendant testified that he had not had possession of the documents since July 1, 1954; and other witnesses attested to destruction of earlier records in April or May of this same year. Judge Weinfeld on November 16 directed production of the 1952 and 1953 records and imposed a contempt sentence on November 19 when they were not produced. Application of Patterson, D.C.S.D.N.Y., 125 F.Supp. 881.

The law of criminal contempt is clear that no individual may refuse to surrender existing documents of a corporation or association if they be within his control. United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906; United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, 152 A.L.R. 1202; Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D 558; United States v. Field, 2 Cir., 193 F.2d 92, certiorari denied 342 U.S. 894, 72 S.Ct. 202, 96 L.Ed. 670, certiorari dismissed 342 U.S. 908, 72 S.Ct. 303, 96 L.Ed. 679.[1] There was sufficient evidence to support the finding of the trial judge that the receipt books for 1952 and 1953 were still in existence in June, 1954, when the statements based upon them were produced for agents of the Bureau of Internal Revenue. From this, and from the fact that the defendant had made contradictory statements about the whereabouts and existence of the records in June, Judge Weinfeld concluded that the government had made out a prima facie

---

[1]. The last case cited, together with United States v. Field, 2 Cir., 193 F.2d 109, and Green v. United States, 2 Cir., 193 F.2d 111, are all affirmances of convictions for contempt for failing to produce records of the Civil Rights Congress, though not touching the issue here crucial of their continued existence. See

also United States v. Patterson, 92 U.S. App.D.C. 222, 206 F.2d 433, affirming dismissal of an indictment against this defendant for failure to produce such records in response to a Senate committee subpoena on the ground of lack of jurisdiction in the committee.

case for October, 1954, when the subpoena issued, and November, 1954, when the alleged contempt occurred. And, going on this assumption, he held that the defendant had not met the burden thus thrust upon him by testifying: "I have no knowledge of the whereabouts of the books called for, nor whether they are in existence. * * * I have not seen those books since July." Judge Weinfeld then sentenced the defendant for contempt, despite the fact that he held that the defendant had been justified in invoking the privilege against self-incrimination when asked about the whereabouts of the books from July to November.[2] Legal basis for resort to the privilege was found in the fact that testimony as to destruction of the records might lead to prosecution for violation of I.R.C. § 145(b) and evasion of the tax or for perjury with regard to a prior affidavit, made in June, 1954, denying knowledge of the whereabouts of the records at that time.

■ The decision below thus rested primarily on a presumption of continued possession and existence held sufficient to constitute a prima facie case for the government. Neither the existing precedents nor the facts of this case warrant such a drastic shifting of the burden of proof in a criminal case. As the Supreme Court said in Maggio v. Zeitz, 333 U.S. 56, 65, 68 S.Ct. 401, 406, 92 L.Ed. 476: "Language can, of course, be gleaned from judicial pronouncements and texts that conditions once existing may be presumed to continue until they are shown to have changed. But such generalizations, useful enough, perhaps, in solving some problem of a particular case, are not rules of law to be applied to all cases, with or without reason. * * * Under some circumstances it may be permissible, in resolving the unknown from the known, to reach the conclusion of present control from proof of previous possession. Such a process, sometimes characterized as a 'presumption of fact,' is, however, nothing more than a process of reasoning from one fact to another, an argument which infers a fact otherwise doubtful from a fact which is proved." The presumption is thus no more than a common-sense inference, as strong or as weak as the nature of the surrounding circumstances permits. Brune v. Fraidin, 4 Cir., 149 F.2d 325. That also has been the established rule in this circuit. In the two cases where we have upheld a factual inference of present from past possession, the time period so spanned was short, and outside motivation for destruction of the particular records there involved was lacking. United States v. Goldstein, 2 Cir., 105 F.2d 150; In re Arctic Leather Garment Co., 2 Cir., 89 F.2d 871.

Here, in contrast, several significant facts make continued existence and possession of the 1952 and 1953 records on the whole unlikely. Patterson's own possession was undeniably interrupted by his jail sentence from July to September. During that time other officials of the Civil Rights Congress might well

---

2. The defendant invoked the Fifth Amendment on several different occasions:

"Q. Mr. Patterson, where are the books that are called for by Grand Jury Exhibit 1?
[After direction to answer]
"The Witness: I must decline to answer on the grounds anything that I might say might tend to incriminate me.
"Juror: How will it tend to incriminate you?
"The Witness: Not because anything in the books themselves are incriminating, but that it creates the impression that I have personally, or through direction, either destroyed or made the books inaccessible. That would, of course, tend to incriminate me."
"Q. Mr. Patterson, are the books called for by Grand Jury Exhibit 1 of to-day's date, the subpoena, in the possession of any head of any of your chapters?
[After direction to answer]
"Witness: I must decline on the ground that anything that I might say might tend to incriminate me. I would just like to also say this to the Grand Jury, that such a question implies that I did away with the books, and I want clearly to have such a question not placed on the record which would tend to put me in a position of perjury."

have taken it upon themselves to do away with these records. The very existence of these records had already once sent their Executive Secretary (and others) to jail. Furthermore, the Civil Rights Congress was being investigated by the New York Legislative Committee to Investigate Charitable Agencies and Philanthropic Organizations; and a hearing before the federal Subversive Activities Control Board concerning listing as a Communist-front organization was pending. In the light of all this hostile official scrutiny it would have been natural for the officers of the Civil Rights Congress to have thought it advisable to destroy records which might lead to identification and exposure of their contributors. There is nothing to show that, given this motivation, these officers could not have destroyed these records, since they were never in the exclusive physical custody of Patterson, even when he was not in jail. See Healey v. United States, 9 Cir., 186 F.2d 164.

The government contends that an impossible burden will be placed on it if in cases like this it must introduce positive proof of continued existence. While it is true that the prosecution need not negative every self-exculpatory suggestion of a recalcitrant witness, it cannot completely sidestep its burden of proving guilt beyond a reasonable doubt. The tests recently reiterated in United States v. Fleischman, 339 U.S. 349, 361, 70 S.Ct. 739, 745, 94 L.Ed. 906, emphasize that before the burden of proof may be shifted, the government's case must be independently established to some extent, and there must be a "manifest disparity in convenience of proof and opportunity for knowledge." Out-side of the challenged inference and temporally remote contradictory statements by the defendant,[3] independent evidence for conviction is lacking here. More important, there is no "manifest disparity in convenience of proof" when the defendant can extricate himself from his predicament only by opening the door to criminal prosecution on other charges. The defendant can here legally be jailed only for a contempt in failing to produce the sought-after books when they are fairly shown to be presently within his power and control. He cannot legally be jailed for contempt for invoking his constitutionally protected privilege not to be a witness against himself. But that in effect is what has happened. The result is the more strange, since court and counsel below respected his privilege and did not press him further or beyond the point stated. There is thus nothing to fill the gap in the proof; hence his conviction must be reversed. Healey v. United States, supra, 9 Cir., 186 F.2d 164, 170, 171. We therefore remand the proceeding for his release.[4] This should be effected at once in order that the case not become noot. See Patterson v. United States, 75 S.Ct. 256, per Acting Circuit Justice Frankfurter.

The judgment is reversed and the proceeding is remanded for the immediate discharge of the defendant from custody. The mandate of this court will issue at once.

HINCKS, Circuit Judge (dissenting).

As the majority opinion discloses, "There was sufficient evidence to support the finding of the trial judge that the receipt books for 1952 and 1953 were still in existence in June, 1954". The

3. Since the defendant was undoubtedly correct in denying physical custody of the records from July 1 on, when he was in jail, his prior inconsistent statements about their whereabouts before July 1 lose their probative force. They may have been relevant to his first conviction for contempt in June, but can hardly be said to carry over in substitution for proof of guilt in this case.

4. The defendant's further contention that he was not afforded notice and a fair hearing as guaranteed by Fed.Rules Crim.Proc., rule 42(b), we find without substance. He was always represented by counsel, with every opportunity to cross-examine witnesses. Significantly he never requested further hearings or extensions of time to prepare his defense. United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884; Lang v. United States, 2 Cir., 55 F.2d 922, certiorari dismissed 286 U.S. 523, 52 S.Ct. 495, 76 L.Ed. 1267.

evidence also showed that these receipt books were indeed "books" as distinguished from loose papers; that each of them contained records of transactions extending at least over several months; that it had been the practice of the Civil Rights Congress (CRC) to preserve such books for a period of years; and that these particular books had not been destroyed when inspection thereof was first demanded by an Internal Revenue Agent in April 1954 but on the contrary were still in existence in June—several weeks after a subpoena had actually issued on May 12, 1954 calling for the production of the 1950–1952 receipt books.

Defendant's own testimony of May 27, 1954 showed that as Executive Secretary and national head of the CRC he, and no other official or individual, had authority to produce the records. In November he testified that he had been head of CRC from April 1948 continuously to date, including the 90-day period of his jail term which had terminated on September 28, 1954; that he had responsibility for the books and records; that "there is not an available record in my office which would not be produced at my request"; and that the heads or secretaries of CRC chapters "have a responsibility to carry out my directives."

In April 1954, a revenue agent in the course of an audit of the CRC books demanded to see its receipt books for 1950–1952 and was told by the CRC bookkeeper that the books were available but that she would never give them to him or that he would never see them. On June 17, 1954, the defendant filed an affidavit in opposition to a contempt citation in which he swore that he then believed that the books for 1950–1952 had been contained in cartons which had been destroyed while in storage. But the government produced credible evidence that the cartons thus referred to had been destroyed in April 1954: yet, as noted above, the books for 1952 and 1953 were still in existence in June 1954.

The defendant himself throughout took the position that the government had no right through inspection or production to see the receipt books. On October 22, 1954, when he appeared before the Grand Jury in response to its subpoena, he testified that the books called for "were not possessed by us or available to us in June, last June." As to this, his counsel now concedes by brief "that there was evidence from which the court might logically infer that the duplicate receipt book for the year 1953 was in existence in June. * * * and that there was further evidence (although inadequate in the opinion of the writer—i. e. appellant's counsel—) from which the court below might have inferred that the 1952 records as well as the 1953 records existed in June 1954." He then proceeded to testify that the records "are not available now." He gave as further reasons for noncompliance an assertion that the subpoena was part of a national "witch hunt" against progressive organizations not in pursuit of any legitimate government function and, lastly, that the Internal Revenue Service had no valid interest in the CRC because CRC was exempt from taxation under the Internal Revenue Code as a civil league. As to the receipt books, he testified "We do not have them, I do not know who possesses them if they exist—they are not available and in so far as my knowledge is concerned are not in existence." And when asked what steps he had taken to locate the records since September 28, 1954 (when he had completed his prior sentence for contempt) he testified that "on advice of counsel, I myself made a most extensive search of every one of the five rooms in which our offices are located although that had been done by me before and had been stated in the previous record that they were not available." It is perhaps worth adding that there was no evidence of threat, direct or implicit, to destroy the records and no evidence that the defendant made other effort to obtain the records other than

that just above quoted from his testimony.

In view of the defendant's continued control of all records of CRC and the demonstrated and conceded existence of the particular records in June, I think Judge Weinfeld's finding that the records were still in existence ·in November and hence within the defendant's control was a reasonable common sense inference of ample strength to support the conviction. Certainly the Judge was not bound to believe the defendant's uncorroborated assertion in October that the records were not available, especially in view of the fact that that assertion when earlier made had concededly been proved false. The inference was weakened not at all by the fact of the defendant's term in jail from July 1 to September 28, 1954. To be sure he was then not in possession of the records. But so far as the evidence goes he had never been in possession. Control of the records was the basis of the decision. In the setting of this case, the records could have been removed from the defendant's control only by their destruction. And the failure of the government to produce evidence to negative destruction did not in my judgment make it unreasonable to infer from the existence of the records in June that they were still in existence in November in view of the nature of the records and the practice of CRC in preserving its records as stated above.

The majority opinion suggests that in the situation which existed after the defendant went to jail in July, the records demanded might have been destroyed by other officers of CRC motivated by desire to put them beyond reach of governmental scrutiny. But that objective could be as well achieved by secreting the records—a method which had been successfully sampled in May—as by their destruction. Moreover, in the circumstances here the deliberate destruction of the records would have been an illegal act giving rise to serious sanctions.[1] That factor made the bare possibility of destruction even more remote and too conjectural, in my judgment, to affect the inference otherwise permissible of the continued existence of the records. If, as my colleagues suggest, it would be "natural" for CRC officials to destroy records merely to prevent the disclosure of the names of its contributors, it would be at least equally natural to suppose that the hazard of criminal sanctions would prevent action to destroy a record not incriminative of anyone.

Moreover, the persistent attitude of non-compliance and defiance on the part of Patterson and other employees of CRC beginning at least as early as April 1954 were additional factors which made it unnecessary for the government to negative the possibility of destruction under the doctrine of United States v. Fleischman, 339 U.S. 349, on page 360, 70 S.Ct. 739, on page 745, 94 L.Ed. 906, where the court posed this question:

> "It may be argued, however, that respondent may have adopted the position of the other members of the board only after she had tried in good faith to bring about compliance with the subpoena. Or perhaps she had been ill or necessarily out of town immediately prior to April 4. Granting that these or other excuses for nonaction may exist, must the Government negative each, or was the burden on respondent to advance them as defensive matter?"

It was held that the burden of going further rested on the defendant. Here the excuse given was that the records sought were unavailable. There is fully as much reason here as in Fleischman to accept the government's proofs as sufficient in the absence of credible rebuttal by the defendant.

The majority quotes from Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476, which is the leading modern ju-

---

1. This obviously is not a case relating to a record innocently lost or misplaced. In May its importance had been so emphasized that its inadvertent loss or destruction thereafter is a possibility which exceeds the bounds of rational hypothesis.

dicial decision on turnover orders in bankruptcy. I think that case supports the conviction here. On page 66, of 333 U.S., on page 406 of 68 S.Ct., it was stated "The inference of continued possession might be warranted when applied to books of account which are not consumable or marketable, but quite inappropriate under the same circumstances if applied to perishable merchandise or salable goods in considerable demand." See note 1. And in Maggio the contempt conviction was reversed primarily because the courts below had misconceived the law. I do not read the case as even suggesting that a finding of continued existence of controversial records such as was made in the setting of the case, was unreasonable or invalid. Certainly Judge Weinfeld's opinion disclosed no misconception of the applicable law. Here the majority judges, unlike the judges of this court who sat on the Maggio appeal, In re Luma Camera Service, Inc., 2 Cir., 157 F.2d 951, 955, do not go so far as to say "we *know* that Maggio (who for purposes of this case is Patterson) cannot comply". They say only that greater proof of ability should have been made by the government. With the Maggio decision before him, the learned editor of Collier on Bankruptcy, Vol. 2, par. 23.10(2), states: "After the trustee has introduced some evidence that the goods were once, or are presently, in the possession or control of the defendant, the burden of *going forward to explain* is then on the defendant * * *. Mere silence, of course, is not enough. A sworn denial of possession or control is not enough." (cases cited) I think that doctrine is applicable at least to the facts of this case.

The majority opinion in part seems to rest on the notion that the defendant's conviction was the result of his invoking the Fifth Amendment. As to this, Judge Weinfeld made it plain in his opinion that his finding of ability to comply rested not at all on unfavorable inference from Patterson's refusal to answer questions. And the defendant was not jailed for refusing to answer questions. He was jailed only for refusing to produce documents found to be within his control upon evidence sufficient without inference deriving from the invocation of the Fifth Amendment.

The majority opinion seems to assume wholly without evidence that when the government's proofs had been concluded the defendant may have had an effective rebuttal on the issue of continued existence which he could not present without incriminating himself or his subordinates with respect to other possible charges, as, for instance, that the books had been destroyed by his or their deliberate act. And it is indeed a possibility that Patterson was in this dilemma. But certainly Patterson had no right, constitutional or otherwise, to spare his subordinates from incrimination. Nor was he personally entitled to the benefit of a rebuttal which he had full opportunity to present but elected not to present. To hold otherwise is in effect to make the Fifth Amendment a substantive defense to a criminal charge supported by sufficient evidence. Surely a defendant who stood mute throughout trial cannot upset his conviction on a charge supported by adequate evidence by suggesting that at the time of the offense charged there was a possibility that he was engaged, say, in a burglary elsewhere,—an alibi which he could not prove without self-incrimination. In my analysis, no real question under the Fifth Amendment is involved in this case. Silence may be golden. But the Fifth Amendment is not a formula for alchemy.

It is true that the inference which we sanctioned in United States v. Goldstein, 2 Cir., 105 F.2d 150, happened to be one of continuing existence for only 11 days, and in In re Arctic Leather Garment Co., 2 Cir., 89 F.2d 871, was only six weeks. The fact that here the critical interval was some four months does not make the principle of these decisions inapplicable to records too important to be mislaid and too permanent to evaporate. The suggestion in the majority opinion that the length of the interval depends upon

an absence of incentive to destroy, if carried to its logical conclusion would mean that the admitted existence of records *yesterday* would not support an inference of their existence *today*. For records such as these could be destroyed in but an hour.

Indeed, the effect of the majority holding is to sap the vitality of compulsory disclosure not only when invoked by duly constituted governmental agencies acting in the proper discharge of their legitimate functions but also in civil proceedings. Under such doctrine, it would appear, a corporate executive can refuse to disclose documents concededly having recent existence and, by standing mute, make it impossible to prove in ensuing contempt proceedings that his conduct was contemptuous. Generally, the objective of compulsory disclosure is to obtain material which it is to the interest of the witness to withhold. That mere incentive to destroy kills the inference of continued existence, I think unfortunate doctrine. Cf. United States v. Fleischman, supra.

I would affirm on the well-reasoned opinion of the able and experienced trial judge.