**In re GRAND JURY SUBPOENA DUC-
ES TECUM DATED APRIL 23, 1981.**

**No. 11–188.**

United States District Court,
S. D. New York.

Sept. 9, 1981.

Kasanof, Schwartz & Iason, New York City, for witness; Robert Kasanof, Lawrence Iason, Bart M. Schwartz, New York City, of counsel.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., by Nathaniel Akerman, Asst. U.S. Atty., New York City, for appellee.

## OPINION AND ORDER

SOFAER, District Judge.

On April 23, 1981, a grand jury in the Southern District of New York served a subpoena on the witness involved in this proceeding. The witness refused to provide the documents called for by the subpoena. The government then took the witness before the Honorable Edmund L. Palmieri, acting as Part I Judge. After briefing, argument, and an in camera examination of the documents, Judge Palmieri ordered the witness to produce the subpoenaed documents. When the witness again refused, Judge Palmieri held him in contempt, but stayed enforcement pending an appeal. A panel of the Second Circuit Court of Appeals, 657 F.2d 5, heard the appeal and remanded the matter for further proceedings.

The subpoena calls for all of the witness's "original pocket calendars and desk calendars reflecting business appointments between January 1, 1973, and December 31, 1978." The witness, an officer at Warner Communications, Inc. ("Warner"), asserted that the calendars are private papers and therefore exempt from subpoena by virtue of the fifth-amendment privilege against self-incrimination. Judge Palmieri disagreed: relying on his in camera, ex parte examination of the documents, Judge Palmieri held that the privilege was inapplicable both because the documents are corporate, and therefore outside the privilege under long-standing doctrine, and because the subpoena sought "no testimony." Joint Appendix at 38, *In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981*, 657 F.2d 5 (2d Cir. 1981). On appeal, the witness reasserted that the calendars are private and therefore privileged. The government asked the Circuit Court to affirm the District Court's ruling that the calendars are corporate and, as such, not privileged; the government also argued that after *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), even if the calendars are private, such documents no longer come within the fifth-amendment privilege. *See e. g., The Supreme Court, 1975 Term*, 90 Harv.L.Rev. 56, 76–78 (1976). Addressing the first of the government's contentions, the Court of Appeals concluded that

in determining whether the documents are personal or corporate, the issue is whether by requiring their production, the witness is being compelled to testify against himself. The following nonexhaustive list of criteria is relevant to this determination: who prepared the document, the nature of its contents, its purpose or use, who maintained possession and who had access to it, whether the corporation required its preparation, and whether its existence was necessary to the conduct of the corporation's business.

*In re Grand Jury Supoena Duces Tecum Dated April 23, 1981*, 657 F.2d 5 at 8 (2d Cir. 1981). The Court remanded the case for further consideration of the specified criteria. In its remand order, the Court also noted that in the Second Circuit the fifth-amendment privilege applies, even after *Fisher v. United States, supra,* to an individual's production of his private papers pursuant to a subpoena. Because the government has accepted that ruling as binding in this case, the issue on remand to the District Court is whether the subpoenaed calendars are private and therefore privileged, or corporate and therefore subject to call.

When the matter was returned to the District Court, some extraordinary procedural steps became necessary to compile a record responsive to the Circuit Court's order. A hearing was held to determine the nature of the calendars' contents, the relevant criterion on which the Court of Appeals appeared to find the greatest uncertainty. Warner's Senior Vice President in charge of administrative affairs testified about company policy on desk and personal calendars. In addition, the witness's former secretary testified in the presence of both parties to what she knew of how both sets of calendars had been maintained and of what they contained. After both sides were permitted to examine the secretary on these general matters, the government left the proceeding, as it had no right to know the actual contents of the calendars prior to their surrender. The District Court then questioned the secretary in the presence of the witness and his attorneys about the actual contents of the desk calendars, to which the secretary had been given access in the course of her employment by the witness. The Court and the secretary together examined three full months of entries in each of two different calendar years, as well as many randomly selected entries from other years. The secretary testified that the portions examined were representative of the desk calendars she had actually seen. Transcript of Hearing at 47, 54–55, 57–58 (Aug. 19, 1981) [hereinafter cited only as Transcript]. In the course of examining the desk calendars the secretary also examined and responded to questions about pieces of paper interspersed among the pages of the desk calendars; the Court of Appeals had referred to the pieces of paper in its opinion, but the express terms of the subpoena did not cover them. The witness's attorney conceded that any material actually affixed to the desk calendars should be treated as part of the calendars.

After examining the desk calendars, the district judge showed the secretary the pocket calendars, which she identified as belonging to the witness. Counsel for the witness objected to allowing the secretary to examine the contents of the pocket calendars, noting that she had no prior access to them. The Court asked the secretary to demonstrate how close she had come to the calendars when the witness had made entries. She answered that she had been able to see the inside of the calendars but unable to read any of the writing or numbers on the pages. Transcript at 60. The district judge then read to the secretary some names that were written in the pocket calendars; the secretary testified that several were names of corporate officers, or of business associates, or of entities related to the witness's work. Transcript at 63–65. Following that inquiry, the secretary left the hearing room, and the district judge examined parts of the pocket calendars in the presence of the witness and his attorneys. After being satisfied that the calendars had been adequately scrutinized, the Court invited comments on the need for further examination. The Court responded to the comments offered and proceeded to make findings concerning the nature of the calendars' contents. Those findings, Transcript at 79–83, incorporated here by reference, were later provided to the government, and the Court heard brief arguments from the parties on whether the calendars are corporate or private.

■ It is long-established doctrine that the fifth-amendment privilege against self-incrimination is inapplicable to corporate

papers. In the first important American case on the subject, the papers held subject to subpoena—the contents of a copy ledger—were owned by the corporation and had been demanded from the individual involved by both the government and the corporation's board of directors; in addition, the district judge in the case had agreed to delete any personal papers inside the copy ledger. *See Wilson v. United States*, 221 U.S. 361, 378, 31 S.Ct. 538, 543, 55 L.Ed. 771 (1911). In subsequent cases, the Supreme Court has made clear that the doctrine applies to corporate papers possessed and owned by a defunct corporation's former officers, *Wheeler v. United States*, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913), to papers of associations such as labor unions, *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944), and to papers of a small law firm operating as a partnership, *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974). The doctrine, as its rationale was articulated by Mr. Justice Thurgood Marshall in his opinion for the Court in *Bellis v. United States*, rests on two premises: (1) that subpoenas for non-private papers do not involve the coerced personal testimony historically protected by the fifth amendment; and (2) that access to the papers of an association is both less intrusive of privacy and more essential for public or private control of the association than access to private papers. The privilege is personal and therefore limited to materials held solely in an individual's personal capacity, wrote Justice Marshall, and "a substantial claim of privacy or confidentiality cannot often be maintained with respect to the financial records of an organized collective entity." *Id.* at 90, 92, 94 S.Ct. at 2184, 2185.

■ Although the broad parameters and rationale of the corporate-private distinction are now clear, particular documents sought in subpoenas can give rise to considerable uncertainty. No fifth-amendment privilege applies when the government seeks the books and records of a company or association, such as ledgers, receipt books, minutes of directors' meetings, and other official or quasi-official documents.

And documents "created or authenticated by a State or the Federal Government . . . would seem ordinarily to fall outside the protection of the privilege. They hardly reflect an extension of the person." *Fisher v. United States, supra*, 425 U.S. at 426, 96 S.Ct. at 1588 (Brennan, J., concurring). By contrast "non-business economic records" (including non-business cancelled checks or tax records), personal letters, and papers "in the nature of a personal diary" are private, and therefore presumably protected. *Id.* at 427, 96 S.Ct. at 1589. Problems are posed by cases falling between these two extremes: for example, when the books sought are not required to be kept by the corporation or by any regulatory agency, but are kept merely for the individual corporate officer's convenience, particularly when the books or papers are preserved by the officer and maintained in his own possession and control outside the office.

For guidance in interpreting the corporate-private distinction in the area of uncertainty, one must examine the first of the Supreme Court decisions expounding the distinction, *Wilson v. United States, supra*, which contains the only reasonably extensive judicial discussion of the issue. In that case, the president of a company was served with a subpoena demanding that he produce "letter press copy books", which contained copies of correspondence he had written. "[T]here can be no question of the character of the books here called for," said the Court. 221 U.S. at 377, 31 S.Ct. at 543. They were "books of the corporation," and copies of letters written by the president in the course of the company's business "were as much a part of its documentary property, subject to its control and to its duty to produce when lawfully required in judicial proceedings, as its ledgers and minute books." *Id.* The witness had asserted in the district court that the copy book contained, not only copies of his corporate correspondence, but his personal correspondence as well. The Court, however, noted that the witness's personal letters were not demanded and could readily have been removed. "Plainly he could not make these

books his private or personal books by keeping copies of personal letters in them." *Id.* at 378, 31 S.Ct. at 543. Yet the witness refused to produce even the corporate letters contained in the book, arguing among other things that, because the corporate correspondence contained his own thoughts and words, his own testimony, he should not be forced to provide it pursuant to subpoena. The Court rejected that argument on the ground that a corporate document is no less subject to production because it consists in part of the writing of the individual subpoenaed to produce it.

> [W]here an officer of a corporation has possession of corporate records which disclose his crime, there is no ground upon which it can be said that he will be forced to produce them if the entries were made by another, but may withhold them if the entries were made by himself. The books are no more his private books in the latter case than in the former; if they have been held pursuant to the authority of the corporation, that authority is subject to termination.

*Id.* As a final argument, the witness contended that the records were protected because they were in the custody of an individual. In rejecting this argument, the Court held that access to corporate documents by people other than the individual having custody is part of the price of doing business in the corporate form, and that the corporate status of particular documents turns not on the corporation's ownership of them, nor on whether a regulatory agency or the corporation required them to be prepared, but on their "nature" and "the capacity in which they are held." *Id.* at 378–82, 31 S.Ct. at 543–45. The documents in *Wilson* were letters written to conduct corporate business and, as such, were corporate.

In *Wheeler v. United States, supra,* the Court underscored the central holding of *Wilson.* The *Wheeler* Court held that documents corporate in their "essential character" must be produced under subpoena, even if they are held and owned by the witness. 226 U.S. at 490, 33 S.Ct. at 162. If ownership and right of access have any evidentiary significance for determining the corporate or private status of documents, therefore, they appear relevant primarily as of the time the documents are actually in use, when the corporation's possible ownership or right of access would likely have been manifested. Cases following *Wilson* and *Wheeler* have similarly emphasized the nature of the documents and the capacity in which they are held, rather than any particular facts such as ownership or right of access, in determining the corporate or private character of documents. *See United States v. White, supra,* 322 U.S. at 698–705, 64 S.Ct. at 1251–1254; *Bellis v. United States, supra,* 417 U.S. at 97–101, 94 S.Ct. at 2187–2190.

■ *Wilson* and its progeny are not the only sources of guidance on the relevance and relative importance of particular circumstances in determining whether documents are corporate or private. The Supreme Court has considered cases involving "required records," *e. g., Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), and the lower federal courts have heard cases involving records very similar to those sought in this case. The required-records doctrine provides little guidance. It is an exception to the rule that a person doing business as an individual proprietor may assert a fifth-amendment privilege even with respect to business records. The exception to the privilege covers those records that the government requires an individual business proprietor to prepare, and the only limitation on the government's power to demand access to (and preparation of) specified records is that they involve some "public aspects." *See e. g., Shapiro v. United States, supra,* 335 U.S. at 32–35, 68 S.Ct. at 1391–1393; *Grosso v. United States, supra,* 390 U.S. at 67–69, 88 S.Ct. at 713–714. Wigmore has cogently argued that, for fifth-amendment purposes, it simply does not matter who required the record to be kept, who actually prepared the record, where it was maintained, why it was required, and what it contained. 8 J. Wig-

more, *Evidence in Trials at Common Law* § 2259c, at 366–67 (McNaughton rev. ed. 1961). At most, therefore, the required-records analogy tends to establish that documents deemed to be corporate by the government or by the corporation will be treated as such as long as the designation has a reasonable basis.

Several decisions in the lower federal courts specifically address the status of calendars used by corporate officers. If those cases establish anything, it is that generalization about this type of document may easily mislead. Some so-called diaries are clearly corporate or required records. For example, an officer's diary is a corporate record if it is used to record entertainment expenses and is actually submitted to the company for use as the proof required by the Internal Revenue Code, *see* IRC § 274(d); IRS Reg. § 1.274.5(c)(2)(i) (taxpayer must keep record to establish each element of expenditure), to support the company's deductions of those expenses; and the officer cannot change the nature of the document by including private and personal matter in the diaries. *See United States v. Waltman*, 525 F.2d 371, 373–74 (3d Cir. 1975), *vacating and remanding*, 394 F.Supp. 1393, 1394 (W.D.Pa.). Similarly, when an officer makes personal notes on a corporate record, or includes corporate records such as cancelled checks with his personal records, he does not thereby affect the corporate nature of the documents, which remain outside the privilege. *See United States v. Peter*, 479 F.2d 147, 149 (6th Cir. 1973) ("Appellant could not clothe the records of his two corporations with immunity by mingling them with his personal records."); *United States v. Mandel*, 437 F.Supp. 258, 261 (D.Md.1977) (day-timer records of attorney remain without the privilege despite personal notations), *aff'd in part and vacated and remanded in part on other grounds*, 591 F.2d 1347 (4th Cir.), *aff'd en banc*, 602 F.2d 653 (4th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). That personal notations appear on the witness's desk calendars in this case, therefore, would not prevent their being deemed corporate if other circumstances warranted that designation.

More often than not, desk calendars have been found to be corporate documents. That conclusion has been reached where the calendars were used in the company's office and left on the officer's desk while in use, where they were useful as records of corporate activity and were in fact used for that purpose, and where the officer's secretary, if not others, had access to the calendars. The courts ruling on the question have found it barely or not at all significant that the company did not supply the calendars, or did not require calendars to be used, filed, or retained; that no one but the secretary had access to them; that the calendars contained a significant number of personal notations; or that the calendars are in the officer's possession at the time they are sought by subpoena. *See United States v. MacKey*, 647 F.2d 898 (9th Cir. 1981); *Brink v. DaLesio*, 82 F.R.D. 664 (D.Md.1979); *In re Grand Jury Proceedings*, 349 F.Supp. 417 (N.D.Ohio 1972); *In re Grand Jury Investigation*, 338 F.Supp. 1379 (W.D.Pa.1972).

The views expressed in the cases passing on desk calendars appear consistent with *Wilson v. United States, supra*, and its progeny, and also with the premises of the corporate-records exception as explained in *Bellis v. United States, supra*. A desk calendar that is useful for corporate business, used predominantly for that purpose, kept open in a company office during its use, and available as necessary to corporate personnel is a record of the sort that a company or regulatory agency might reasonably need and seek to examine; its required production is markedly unlike the testimonial coercion associated with the history of the fifth-amendment privilege; and mandating production is unlikely to pose a substantial threat to the witness's interest in the privacy of his purely personal affairs.

By the criteria that the Court of Appeals found relevant, as well as by the *Wilson* standard as it has been developed, the desk calendars in this case are corporate documents. The record in this proceeding establishes that the desk calendars here

were used primarily for corporate business and that their contents are overwhelmingly corporate, although some personal notations were made in them. The witness's secretary identified many of the names noted on various pages in the calendars as those of Warner Communications officials or of persons associated with such officials or with the company. Many of the notations were accompanied by numbers indicating the purchases or sales of securities or interests in partnerships, and both the witness's secretary and Warner's Senior Vice-President for administrative affairs testified that the witness's primary role at Warner was to help other corporate officials in their corporate and personal financial affairs, reminding them of due dates on notes and other obligations. Transcript at 10, 18. Because of his role at Warner, moreover, the witness must have found the desk calendars, though not absolutely necessary, extremely useful in his corporate activities. The desk calendars were used to remind the witness of matters that he had to handle for Warner officials. Transcript at 22.

Warner did not require either the witness or any other officer to obtain, use, file, or retain desk calendars. The company did, however, provide the witness and many others with desk calendars, no doubt for the purpose of increasing their efficiency. Warner's company policy has been to offer to provide desk calendars to any of about three hundred employees, of whom about half request calendars or refills. The company annually spends about $120 to purchase a sufficient supply of desk calendars and refills; though the sum is small for a major company, it nevertheless reflects a corporate purpose. Many of the officers who decline Warner's inexpensive calendars may in fact obtain calendars from other sources. See Transcript at 5–6.

The witness took personal custody of the desk calendars after each year of use by taking them to his home. While they were in use, however, the desk calendars were left open on the witness's desk, and his secretary had access to them. Transcript at 19. Occasionally, she may have made entries in them. Indeed, no security was maintained over the desk calendars while they were in use; anyone who entered the witness's office could walk over to his desk and examine the calendar in his absence.

In characterizing documents such as desk calendars, their size, form, and ownership or control may also be relevant. Those involved in this case are unbound and have no covers; they are unlike those ordinarily used to record thoughts, impressions, or descriptions of events. Rather, the calendars are typical of those used in offices throughout the nation: they consist of a small metal or plastic stand to which spindles are attached to hold fitted stacks of paper, with one sheet for each day of the year containing hour designations and enough room to write brief messages. To the extent that ownership and right of access may be relevant, the company might well succeed if it pressed a claim of title or superior right to possession. The calendars were purchased by the company and provided to its employees for use as diaries in the performance of their corporate duties. No employee would be free, for example, to sell the calendars. Each calendar is of so little value that the company might overlook such conduct, but the sale of a large number of the calendars might be treated as a theft. For the same reasons, access, too, might be obtained by the company, even against the individual's will, if some corporate purpose required it.

As for the pocket calendars, little authority even indirectly supports the government's contention that they, like the desk calendars, are corporate documents. Numerous decisions either protect personal diaries or state that nonbusiness documents are protected by the privilege from compelled production. E. g., Bellis v. United States, supra, 417 U.S. at 87, 94 S.Ct. at 2182; United States v. Beattie, 541 F.2d 329 (2d Cir. 1976). A pocket calendar is less obviously testimonial than a conventional diary, but even the most abbreviated entries may say a great deal. A few words can tell a reader—particularly a reader who has investigated the author—when, where, and with whom a meeting was scheduled; or when, for whom, for how much, and in

what an investment was made. When an individual produces a document in response to a subpoena, he not only testifies in the act of producing it; he is forced by that act to provide its testimonial contents as well. *Compare Andresen v. Maryland,* 427 U.S. 463, 471–77, 96 S.Ct. 2737, 2743–47, 49 L.Ed.2d 627 (1976) (seizure of documents not testimonial compulsion); *United States v. Mannino,* 635 F.2d 110, 115–16 (2d Cir. 1980) (same). The Third Circuit has recently protected a witness from compelled disclosure of his "purely personal date books"; the opinion in that case offers a cogent treatment of the policy issue and indicates that the Court was fully aware of the possible claim that the documents could have been deemed corporate. *In re Grand Jury Proceedings,* 632 F.2d 1033, 1042–43 (3d Cir. 1980) (citing Supreme Court discussions of corporate-private distinction). *See also United States v. Karp,* 484 F.Supp. 157, 159 (S.D.N.Y.1980).

At bottom, the government's argument is that, if personal calendars are used for corporate affairs, they become corporate rather than private documents. *United States v. MacKey, supra,* provides some support for that view, in its statement that "courts that have considered specifically whether documents are personal or corporate find that mixed documents are corporate and outside the privilege." 647 F.2d at 900. The Brooks Brothers diary and desk-type calendar involved in that case, however, were used in MacKey's roofing business and kept at his office. *Id.* at 899. Moreover, although one of the district court decisions cited in *MacKey* states that, if a "personal record was mingled with notations of a corporate nature, the document loses the cloak of protection," *United States v. Waltman,* 394 F.Supp. 1393, 1394 (W.D.Pa.), *vacated and remanded,* 525 F.2d 371 (3d Cir. 1975), that dictum was skeptically received on appeal to the Third Circuit, which accepted the district court's result only on the premise that the diary had been used to record entertainment expenses and had been submitted to the corporation as the record required for tax deductions. *United States v. Waltman, supra,* 525 F.2d at 373–74.

■ Just as the inclusion of personal matter with or on corporate documents does not change the nature of the corporate documents, the law should not deprive documents private in nature of the protection of the privilege merely because they include some corporate material. A private diary is made no less private because it contains material relating to an officer's corporate employment. Work is part of a person's life, and references to one's work activities will naturally tend to be included in an individual's record of activities. If the private record is used to satisfy some corporate or government record-keeping requirement, then access to it would seem proper, at least to the extent necessary to check the record's accuracy. But where the business notations are made merely as a convenience or aid to the individual involved, the document should retain its privileged status. Unlike desk calendars, such private calendars are not the sort of document on which corporations or agencies are likely reasonably to rely for information; their compelled production is therefore unnecessary to effective regulation. Furthermore, the production of such documents is likely to intrude on many aspects of what the witness expected to be his or her private life or thoughts, and will often lead to revelations and confrontations strongly akin to the compelled testimony historically associated with the fifth-amendment privilege.

■ By these standards, the pocket calendars involved in this case should be protected as private papers. The pocket calendars contain many company-related entries, many references to individuals with whom the witness had business dealings, and, like the desk calendars, many notations relating to business transactions. Nonetheless, the pocket calendars differ from the desk calendars in that they contain many personal entries. Although the witness used the desk calendars almost exclusively for business affairs, he used the pocket calendars to remind himself of religious activities and obligations, of his medical appointments, of

his travels, and of his personal meetings and duties. Another purpose for which he appears to have used the pocket calendars was to record his travels outside New York State in order to provide data to support individual tax claims at the end of each calendar year. In short, the pocket calendars were a more comprehensive memory aid than were the desk calendars, reminding the witness of many more aspects of his life.

Like the desk calendars, the pocket calendars were maintained by the witness. Unlike the desk calendars, however, the pocket calendars were kept by the witness on his person at all times while they were in use. No one had access to them except the witness. Although his secretary's testimony contains some suggestions to the contrary, she never was able actually to see what was inside the pocket calendars. Transcript at 28, 59–60. She merely inferred, from the witness's taking the calendars out of his pocket to make entries concerning his schedule, that the calendars contained a schedule of his business affairs. She did not even know that the pocket calendars contained phone numbers. *See* Transcript at 29, 79.

Warner has no requirement concerning the preparation or preservation of pocket calendars, and in addition provides no such calendars to its employees; indeed, Warner has no policy whatsoever regarding pocket calendars. The pocket calendars under subpoena appear to have been gifts from an investment firm and from a department store, although one may have been purchased. *See* Transcript at 40–41. At least one of the pocket calendars had apparently been sent to an individual other than the witness, but it was used by the witness after the engraved name of the individual who had received it had been obliterated. The pocket calendars, in sum, were in no way obtained from the company; they were selected by the witness himself, who obtained the calendars from extra-corporate sources. The company did not provide them to any of its officers as a device to increase their efficiency.

The pocket calendars are small, like the desk calendars, and useful only for brief notes and messages. But they are bound, with hard covers, and are designed to be carried in confidence. The witness's company would probably fail in any effort to gain possession of, or access to, the pocket diaries without the witness's consent, irrespective of any asserted need to obtain corporate information. Finally, to compel the production of documents such as the pocket calendars for corporate or regulatory purposes would be contrary to normal expectations concerning such documents and, because it would threaten the privacy of witnesses across a broad range of thoughts and activities, would be strongly akin to the type of coercion that one associates with compelled testimony.

Although the desk calendars must be produced, and the pocket calendars need not be, the witness may see fit to seek to protect purely private notations in the desk calendars and the government may seek to secure the surrender of corporate matter in the pocket calendars. In *Wilson,* the Court approved a procedure whereby a corporate officer could withdraw, under the district court's supervision, copies of purely personal letters from a corporate letter-copy book. 221 U.S. at 378, 31 S.Ct. at 543. Other cases have suggested a masking procedure. *See In re Grand Jury Proceedings,* 601 F.2d 162, 171 n.6 (5th Cir. 1979). Some courts appear to afford no such protection, perhaps because they involve situations in which a withdrawal or masking is not readily practicable, and where the personal notes are inextricably integrated into the corporate document. *See, e. g., United States v. Mandel, supra,* 437 F.Supp. at 261 (suggesting that personal notations may be used by government). On the other hand, corporate materials that are readily severable, and materials that constitute some form of required record, have been held producible by subpoena even though they are mixed in with or a part of an individual's personal records. *See, e. g., United States v. Peter, supra,* 479 F.2d at 149 (corporate checks drawn on personal account); *In re Grand Jury Proceedings, supra,* 601 F.2d at 171

(required records). In this case, for example, notations kept in the pocket calendars to provide the basis for establishing a company tax allocation may be subject to subpoena. Ordinarily, however, the notation of a corporate appointment or activity, made in a private calendar as a reminder or aid to an individual, is part of a private document that should not be subject even to examination by a court.

At this stage, whether and how to separate the contents of the two sets of calendars need not be decided. If either party seeks to make an argument along these lines, the proposal for separation must be advanced as concretely as possible, with a proposed procedure for implementation that is both theoretically sound and practicable. Meanwhile, the witness is ordered on pain of contempt to surrender the subpoenaed desk calendars. Irrespective of any claim of privilege, the government will treat the calendars as confidential material, will reveal their contents only as appears necessary to its investigation, and will return the calendars as soon as their retention becomes unnecessary. All material currently in the custody of the Court, other than the desk calendars under subpoena, will be returned to the witness ten days after this decision.

SO ORDERED.