Harold McBRYAR and Jane
Kubelsky, Plaintiffs,

v.

The INTERNATIONAL UNION OF UNITED AUTOMOBILE AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, The International U.A.W.; Local 933 of the International U.A.W.; David L. Fenwick; Terry Yount; Donald R. Winchester, Sr.; and Wayman Wayne Biggerstaff, Defendants.

No. IP 92–34–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 15, 1993.

Richard L. Darst, Mantel Cohen Garelick Reiswerg & Fishman, Indianapolis, IN, for Harold McBryar and Jane Kubelsky.

Nora L. Macey, Macey, Macey and Swanson, Indianapolis, IN, for International Union, International U.A.W. Local 933 of the International U.A.W.

Robert J. Hill Jr., Indianapolis, IN, for David L. Fenwick.

Timothy J. O'Hara, Henderson Daily Withrow Devoe, Indianapolis, IN, for Terry Yount.

Grover B. Davis, McClure McClure & Kammen, Indianapolis, IN, for Donald R. Winchester, Sr.

### ENTRY AND ORDER GRANTING PLAINTIFFS' MOTION TO COMPEL.

FOSTER, United States Magistrate Judge.

This matter came before the Court on the plaintiffs' December 23, 1992 motion to compel the International Union of United Automobile Aerospace and Agricultural Implement Workers of America, the International U.A.W. (the "International"), and Local 933 of the International U.A.W. ("the Local") (collectively referred to as "the Unions") to produce certain tape recordings and transcripts of the plaintiffs' telephone conversations. At hearing on Tuesday, September 28, 1993, oral argument was heard and evidence received. At the conclusion, the Court announced that the International and the Local would be ordered to produce the requested materials, with this Entry to follow. The transcript of that proceeding is incorporated herein.

This is a suit under the Labor–Management Reporting and Disclosure Act (the Landrum–Griffin Act), 29 U.S.C. § 401 *et seq.*, and the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* (wiretaps). The plaintiffs are hourly employees of the Allison Transmission Division of General Motors Corporation and members of the International and the Local. The plaintiffs make the following pertinent allegations in their Complaint. In Septem-

ber 1991 officials of the Local, "caused persons to wiretap" and record telephone conversations between the plaintiffs, Complaint ¶¶ 16, 17,[1] in which they discussed problems in the Local including the out-sourcing of work, misconduct by union officials, misappropriation of union funds by officials, and the unavailability of the shop committee to union members, *id.* ¶ 15.[2] The officials complained about included defendants Terry Yount ("Yount"), chairman of the Local's Speedway Unit[3] Shop Committee, and Donald R. Winchester, Sr. ("Winchester") and Wayman Wayne Biggerstaff ("Biggerstaff"), members of the same Shop Committee. These three officials caused the recordings to be played to others in September 1991, *id.* ¶ 19, and, with other Local agents, also caused a transcript to be made of the recordings, *id.* ¶ 18. On September 5, 1991, Yount called the International to arrange a meeting to discuss union politics and a meeting was scheduled for the next day. *Id.* ¶ 21. On September 6, 1991, Yount, Winchester, Biggerstaff, and Local president (and defendant) David L. Fenwick ("Fenwick") (collectively referred to as the "Local officials"), took the tape and transcript to a meeting with William Osos ("Osos"), the International's Region 3 Director, and Paul Elliott ("Elliott"), Region 3's Service Representative servicing the Local, who reported to Osos. *Id.* ¶ 22. The Local officials played the tape of the plaintiffs' conversations at this meeting and gave Osos a copy of the transcript. *Id.* ¶¶ 23, 24. The plaintiffs allege that the Local officers' purpose in doing so was to solicit the International's assistance "in order to remove [the plaintiffs] from their Allison Transmission union appointed jobs and in order to get them transferred to less desirable jobs to punish them for exercising their rights of free speech and association." *Id.* ¶ 23. Plaintiff McBryar had been appointed by the International to serve as a Quality Network Representative, *id.* ¶ 34, and plaintiff Kubelsky had been appointed by the Local as Training Center Scheduler and Record Keeper, *id.* ¶ 28. Osos notified the International Union office in Detroit, Michigan of the meetings' content. *Id.* ¶ 27. On September 9, 1991, Yount, Winchester, Biggerstaff, and other members of the Bargaining Committee and members of the International used information from the wiretapped conversations to question other employees about the plaintiffs and to question plaintiff McBryar directly. *Id.* ¶¶ 28, 34. Shortly thereafter, the plaintiffs were removed from their union positions and/or transferred to less desirable jobs. *Id.* ¶¶ 29–32, 34–38. The defendants continue to disclose the contents of the wiretapped conversations to others. *Id.* ¶ 41. The plaintiffs claim that the defendants' actions against them constituted violations of the Labor–Management and Reporting Disclosure Act, 29 U.S.C. § 411(a)(1), (2), (4), and (5), by depriving them of their substantive (free speech and assembly) and procedural (disciplinary process) rights, *id.* ¶ 45, and violations of the federal wiretapping statute, 18 U.S.C. § 2511(1)(a), (b)(i), (b)(ii), (c), (d), *id.* ¶ 50.

On January 13, 1992, the plaintiffs served on the International and the Local a Rule 34 request for production of the tapes and transcript of the wiretapped conversations. The International responded that it had no such material within its or its officers' possession or control. It further argues that it lacks the power to obtain the items from the Local because they are separate legal entities and the Union constitution does not give the International such authority. The Local responded that it had no such material within its possession or control as an entity or within the possession or control of its agents "acting within the scope of their authority,"

---

1. "Complaint" refers to the First Amended Complaint filed on September 1, 1993. The amended complaint differs from the original only in the addition of claims against the individually-named Local officers. The present motion to compel is directed only to the International and the Local.

2. The alleged wiretap also captured conversations of Robert Boone, an International Representative, *id.* ¶ 25, and Dennis Hinman, a training scheduler and record keeper at the Allison Transmission plaint, *id.* ¶ 33.

3. The Local consists of the Maywood Unit, the bargaining unit for General Motors' Allison Gas Turbine plant, and the Speedway Unit, the bargaining unit for G.M.'s Allison Transmission plant. Each Unit has its own "Shop" or Bargaining Committee.

and specifically noted that it was not responding on behalf of any individual officer acting in his individual capacity. If any officer now has possession, custody, or control of the tapes and transcript, it contends they do so in their individual capacities only, and the Local has no legal rights over the personal property of its members.

Rule 26(b), Federal Rules of Civil Procedure, permits discovery of any matter "not privileged, which is relevant to the subject matter involved in the pending action" and which is "reasonably calculated to lead to the discovery of admissible evidence." Rule 34(a) permits a party to inspect, copy, test, or sample documents or tangible things which are "within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served...." A party has control or custody of a document or thing when he "has the legal right to obtain the document, even though in fact he has no copy." 8 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2210, p. 621 (1970); *see Scott v. Arex, Inc.*, 124 F.R.D. 39 (D.Conn.1989); *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420 (D.C.Ill.1977); 4A *Moore's Federal Practice*, ¶ 34.17 pp. 34–69 through 34–71 (1993). Ownership is not required; if a party possesses or has custody of a document or thing belonging to another person, the party must produce it. 8 Wright & Miller § 2210, p. 623–24. The plaintiffs have the burden of showing that the tapes and transcript are in the possession, custody, or control of the Unions, and the Court may consider any reasonable evidence regardless of the rules of evidence, *see National Utility Service, Inc. v. Northwestern Steel and Wire Co.*, 426 F.2d 222, 225 (7th Cir.1970).

*Standard.*

The parties were not explicit on the standard governing possession, custody, or control questions involving organizations. They suggested a standard, however, by focusing their arguments on whether the possession or use of the items were within the scope of the Unions' or their officers' authority or

duties. The Local suggested two reasons why it lacks possession, custody, or control. First, it implicitly argues that because illegal acts—such as violations of the federal wiretapping statute, deprivations of statutory rights, and tortious conduct—are not authorized by the organization's formal rules and policies, they necessarily fall outside the scope of the Local's business and do not constitute official Local records. Second, noting that the plaintiffs asserted that the wiretapping was undertaken and/or used to advance the political aspirations of an individual officer and that this denotes a personal, not an official, purpose [4], they argue that the plaintiffs admit that the generation or use of the tapes fell outside the scope of the Local's officer's authority. The plaintiffs counter that because the tapes and transcript were clearly possessed and used by the Unions' top officers for the official purpose of disciplining them for violation of Union rules, they constitute official records in the possession, custody, or control of the Unions through its officers.

Because every organization, including unions, can operate only through the actions of its officers and agents, it can possess, control, or have custody of documents and things only if its officers and agents possess, control, or have custody of them and the mere fact that an officer has possession of or even title to a union's records does not alter their status as official union records. *See United States v. White*, 322 U.S. 694, 702, 64 S.Ct. 1248, 1253, 88 L.Ed. 1542 (1944); *Bellis v. United States*, 417 U.S. 85, 93, 94 S.Ct. 2179, 2185, 40 L.Ed.2d 678 (1974); *Wheeler v. United States*, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913). A union, like any organization, may be held liable for the actions of its officers and agents under ordinary agency principles.

The actions of union officers are tested by common law theories of agency. Thus, if their actions fall within the scope of their authority, they are acting for the union and whatever liability flows from their actions flows to the union also. However, if their illegal actions fall without the scope

---

**4.** Internationally-appointed representatives are forbidden to become involved in local union poli-

tics and Local officers may not use their offices to further their own political aspirations.

of their authority, they must bear the consequences alone.

*Urichuck v. Clark,* 689 F.2d 40, 43 (3rd Cir. 1982); *see also Mayeske v. International Association of Fire Fighters,* 905 F.2d 1548, 1554–56 (D.C.Cir.1990), *cert. denied* 498 U.S. 940, 111 S.Ct. 347, 112 L.Ed.2d 311 (1990). In the same way that a union, as principal-master, may be held liable for the acts of its officers performed within the scope of their employment or authority as servant-agents, *Restatement (Second) of Agency* §§ 219, 220, 228, 229 (1958), so union officers may, within the scope of their authority, generate, acquire, or use official .records on behalf of their union, and exercise possession, custody, or control over them on behalf of the union. The scope of an officer's authority or employment may be broader than the union's formal rules or policies, *see id.* §§ 215, 216, 229, encompassing, in certain circumstances, explicitly unauthorized acts, *id.* § 230, intentional and negligent torts, and illegal actions, *id.* §§ 231, 243–248. *See id.* §§ 215, 216, 218; 53 *Am.Jur.2d,* Master and Servant § 445, p. 463 (1970). Thus, the Local's contention that its lack of authorization for illegal or tortious acts precludes finding that the tapes and transcript were officially generated, acquired, used, or possessed must be rejected. Further, although the Local correctly asserts that the scope of an agent's authority does not include *ultra vires* actions which are solely personally motivated, *see Restatement (Second) of Agency* § 235, it mischaracterizes the plaintiffs' claims. The plaintiffs allege that the defendants generated and used the tapes and transcript in the process of disciplining them for violations of the unions' rules. Enforcing union rules of course benefits the unions and, thus, satisfies the scope of employment requirement. *Restatement* § 236 & comment b ("The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service...."). The focus in determining whether an agent's purpose benefits his principal is not on the purpose, in the sense of *motivation,* for the use of the tapes—in this case, to advance a union official's political position by eliminating opponents—but is on the purposes, in the sense of *uses,* for which the tapes and transcript were generated or used—in this case, to discipline the plaintiffs for violating union rules. The Unions agree that discipline and removal is warranted for International-appointed officials who engage in Local politics [5] and neither party alleges or suggests that the defendant officials or Unions did not have a good faith belief that the plaintiffs violated the rules or that the tapes provided reasonable support for that belief. The defendants' motivations for pursuing such violations is immaterial.

In order to decide whether the Unions have possession, custody, or control of the tapes and transcript, we must determine whether the materials are International or Local records and/or whether the International or Local now have possession or control over them. Although no test was explicitly presented by the parties to distinguish official union records from personal papers, the standards courts have used to resolve objections to producing corporate records on Fifth Amendment Self Incrimination grounds are instructive.

The factors determining whether documents or things are union or personal records include the following:

1. Was it the regular practice of the union, by formal rule or instruction or informal policy or custom, to generate or maintain the documents?

2. Was the purpose for which the documents were generated, acquired, maintained, possessed, or used within the scope of the union's officers' authority or duty? Factors determining the scope of authority include those identified in *Restatement*

---

5. The purported reason for McBryar's removal is indicated to be his involvement, as a representative of the International, in local union politics. Complaint ¶ 35. The reason for plaintiff Kubelsky's discipline and removal is not explicitly alleged, Complaint ¶¶ 28–32, though we may presume for this motion, in the absence of contrary explanations, that it was because of complicity in McBryar's violative conduct..

*(Second) of Agency* § 229*ff.* and the following factors identified in the case law:

 a. Who prepared the documents and who initiated or ordered their preparation;

 b. The degree to which the contents of the documents could serve union or personal interests;

 c. Were the documents generated, acquired, maintained, or used with union assets or instrumentalities; and

 d. Who used the documents.

*See In re Sealed Case (Government Records),* 950 F.2d 736, 740–41 (D.C.Cir.1991); *United States v. Wujkowski,* 929 F.2d 981, 984–85 (4th Cir.1991); *In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981,* 657 F.2d 5, 8 (2nd Cir.1981), *on remand,* 522 F.Supp. 977 (S.D.N.Y.1981); *In re Three Grand Jury Subpoenas Dated January 5, 1988,* 847 F.2d 1024, 1029 (2nd Cir. 1988); *In re Grand Jury Subpoena Duces Tecum Dated January 30, 1992,* 804 F.Supp. 582, 583–84 (S.D.N.Y.1992); *In re Grand Jury Investigation, Special Grand Jury No. II, September Term, 1983,* 600 F.Supp. 436, 438 (D.Md.1984).

■ The second step is to determine whether the Local or International now possesses or controls the tapes and transcript through its officers. The defendants focus on whether its officers possess the materials in their official or personal capacities and one case we found does engage in this analysis. *See Grand Jury Investigation,* 600 F.Supp. at 438 (dividing the Fifth Amendment inquiry into, first, whether the documents are corporate records, and second, whether the possessor possesses them in a representative or individual capacity). If the tapes and transcript are determined to be official union records in the first step of our analysis above, we need then only to consider whether ownership or title has passed to the possessor because if the union has not relinquished ownership (permanently or temporarily), it retains the legal right to obtain them from its officers, *i.e.,* it has "control" of them under Rule 34. *See United States v. Riland,* 364 F.Supp. 120, 121 (S.D.N.Y.1973). The capacity in which an officer holds documents will therefore be determined by whether the documents are official union records and whether the possessing officer has an ownership interest in them which is adverse to the union's.

■ Even if the tapes and transcript are determined not to be official records of the Unions, however, the Court must still undertake this second inquiry into possession and ownership because the Unions are obligated to produce the requested materials if they have possession, custody, or ownership of them regardless of their status as official records. Factors indicating whether a corporate entity has possession or control of requested materials include the following:

 1. The use or purpose to which the tapes were employed;

 2. Whether the materials were generated, acquired, or maintained with union or personal assets or instrumentalities;

 3. Who actually generated, acquired, or maintained the documents;

 4. Whether the possessor or the union determined the material's use, location, possession, or access;

 5. Who actually had access to and/or use of the documents; and

 6. The extent to which the documents' contents serve union or personal interests.

 7. Any formal or informal evidence of a transfer of ownership or title.

*Analysis.*

*A. The Local.*

1. *Are the tapes and transcript official Local records?*

■ a. There was no evidence of a formal or informal official Local policy or practice authorizing wiretapping or the possession or use of wiretapped recordings. Further, no evidence was presented to support the Complaint's allegation that Local officials caused the wiretapping and transcribing of the plaintiffs' conversations.

b. The evidence established that the tapes and transcript of the plaintiffs' conversations were maintained, possessed, and used by the Local's officers for purposes which fell within the scope of the Local's and the in-

volved officers' authority and duties. The following facts are sufficiently shown.

Informal talk about the existence of tape recordings of the plaintiffs' conversations were circulating through the Local community in August or September of 1991. (Flanary, p. 9–13). After hearing the talk, the Local's Second Vice President, Glenn Flanary, expressed his concerns about the ethical and legal implications of the recordings to President Fenwick. (Flanary, p. 15–16, 19–20). Fenwick told Flanary that he had listened to part of the tapes and told Flanary not to worry about them because nothing would come of them. (Flanary, pp. 15–16, 20).[6] Prior to the September 6, 1991 meeting, Terry Yount, chairman of the Local's Speedway Unit Bargaining Committee, Donald Winchester, member of the Committee, and perhaps Fenwick and Biggerstaff, a member of Yount's Committee, had complained to the International's Region 3 Director, William Osos, about the plaintiffs' involvement in Local politics. (Osos, pp. 58–59, 75).

On or about September 5, 1991, Yount told Paul Elliott, an International official reporting to Osos, that Local officials wanted a meeting with Osos. (Elliott, pp. 10, 25). Elliott and Osos understood this request to be on behalf of members of the Local's Bargaining Committee. (Elliott, pp. 10, 25; Osos, p. 35). Elliott merely passed the request on to Osos, (Elliott, p. 10; Osos, p. 35), who directed Elliott to schedule the meeting for the next day and to instruct President Fenwick to attend, (Elliott, pp. 9, 13; Fenwick, pp. 11, 12, 14). Osos also instructed Elliott to at-

tend. (Elliott, p. 9). The meeting took place in the conference room at the International's offices on September 6, 1991. (Fenwick, p. 12; Osos, p. 33–34). In attendance were Osos, Elliott, Fenwick, Yount, Winchester, and Biggerstaff. (Fenwick, p. 13, 14–15; Elliott, p. 15; Osos, p. 33). At this meeting, a tape recording of telephone conversations involving the plaintiffs was played, and a transcript was produced. (Fenwick, pp. 15–16, 37; Elliott, pp. 18, 19; Osos, pp. 36–39, 47, 49; Flanary, pp. 9, 10).

Although Elliott stated that Yount did not inform him of the purpose for the requested meeting, (Elliott, pp. 10, 25), and that he, Elliott, remained unaware of the meeting's purpose before, and even during, the meeting, (Elliott, pp. 9, 10), Osos stated unequivocally that the Local officials in attendance told him they wanted him to listen to the recording because they believed it showed political activity on the part of plaintiffs McBryar and Kubelsky and they wanted Osos "to do something about it", (Osos, pp. 36, 74–75).[7] No notes or memoranda of this meeting are mentioned by any of the deponents and Osos stated he was unaware of any. (Osos, p. 34).

The tapes and transcript were brought to the meeting, played, and removed by Yount, Winchester, and Biggerstaff. (Fenwick, pp. 15, 29, 36; Elliott, pp. 14–16, 27, 30; Osos, pp. 36, 38, 44–46).[8] Although neither Fenwick, Elliott, nor Osos could recall which one or ones of these three actually carried the tapes in or out of the meeting, started the player, or presided at the meeting, they con-

---

6. Fenwick stated that he had not heard about the tapes before the September 6, 1991 meeting in the International's conference room. (Fenwick, p. 52–53, 54).

7. In his later deposition, Fenwick stated that the issue of MacBryar's political activity was never brought up at the meeting, (Fenwick, pp. 28–30), but he admitted that he was absent from the room for extended periods of time, (Fenwick, pp. 16–18). Elliott stated that he also left the meeting several times, (Elliott, pp. 19–25), and therefore didn't know what was transpiring during the meeting, (id., p. 24). Elliott also presented an astounding inability to recall the most basic circumstances even when he was present. (Elliott, pp. 15–25).

8. Fenwick was summoned to the meeting by Osos; arrived at the International offices before Yount, Winchester, and Biggerstaff; spent time with Elliott while waiting for the meeting to begin; entered the conference room with Elliott before the three other Local officers; and periodically left and returned to the meeting. He also indicated that he was not in accord with the possession or use of the tape. This evidence is not disputed by other depositions, allegations, or arguments. It is reasonable to infer, therefore, that Fenwick was not involved in requesting or conducting the meeting and did not carry or play the tapes or transcript at the meeting. Both Osos and Elliott denied possessing the tapes or transcript before the meeting and taking them afterwards. These statements are uncontradicted.

sistently described the three as a unit, the request for the meeting was on their behalf, they entered and left the meeting together, and no differences in viewpoint or control of the tapes was noted among them, *id.;* except one. Osos described the only individual action when he said that Winchester was the individual who handed him the transcript of the recording. (Osos, p. 39). This is the only difference among the three that was recalled by the participants who gave evidence. There was no difference of opinion or differentiation in possession or control among the three noted. Thus, it is unnecessary to determine which individual officer or officers maintained actual physical custody of the tapes and transcript or the conduct of each individual officer at the meeting; they acted as a group, evidencing a singleness of purpose and a shared control of the tapes and transcript.[9]

Osos said that, after the tape was played, he told the participants that it had no effect on him because he didn't believe in tapes and he didn't listen to them closely. (Osos, pp. 37, 75–76; Fenwick, p. 37). He also said that he did not recommend the plaintiffs' removals to the International leadership after the meeting. (Osos, p. 57). Flanary stated that after he complained to President Fenwick about the tapes, Fenwick told him not to worry and assured him that nothing would come of the tapes. (Flanary, p. 20). Fenwick testified that the tapes had no importance, validity, or relevance to him. (Fenwick, pp. 38–39, 55). The use of the tapes, however, did prompt official action. Following the meeting, Osos called Steven Yokich, a Vice–President of the International and head of its G.M. Department, and informed him of the Local's complaint against McBryar and requested a formal investigation. (Osos, pp. 57–58). He also advised the Local officials

that they must present a "verbal complaint" or witness testimony in order to pursue their charges. (Osos, p. 76). All actions taken by the International and the Local regarding the plaintiffs' political activities post-date the playing of the tapes at the September 1991 meeting. *See, e.g.,* (Fenwick, p. 52 and exhibits). The inference is reasonable and well-supported, therefore, that the playing of the tapes and the presentation of the transcript at the meeting played a provocative role in initiating and advancing the process of disciplining and removing the plaintiffs from their positions.

The plaintiffs have established that the tapes and transcript were used by Local officers Yount, Biggerstaff, and ,Winchester for the official purpose of advancing their charges that the plaintiffs were violating International and Local policies and that they did so in a reasonable and foreseeable method by playing the tapes for the Local and International Region leadership in a called meeting. The plaintiffs have also established that Osos, Elliott, and Fenwick used the tapes for official purposes. It is reasonable to infer from the evidence that Osos and Fenwick had knowledge of the existence of the recordings and of the Local officers' charges of political misconduct before the September 6th meeting, so it should not have been a surprise to Osos or Fenwick when the Local officers played the tapes at the meeting and asked for action against the plaintiffs. Without expressed objection, Osos, Elliott, and Fenwick listened to the Local officers' presentation, they listened to the tape, and Osos reviewed the transcript; they did not interrupt the proceedings, stop the tape, or otherwise declare that the use of the tapes and transcript were officially improper or beyond the Local officers' scope of authority or duties. The tapes and transcript were

---

**9.** Winchester told Osos that he received the tapes anonymously through the mail, (Osos, p. 41), and perhaps Biggerstaff, Yount, and/or Winchester confirmed this at the meeting, (Osos, p. 50, 70). Osos repeatedly states that "they"—referring to Yount, Biggerstaff, Winchester, and possibly Fenwick—had the tapes, wanted a meeting, brought the tape, played the tape, confirmed Winchester's story, and removed the tape. Neither Osos, Elliott, or Fenwick testify to any conduct or statement by Yount, Biggerstaff, or Winchester which

indicated anything but consensus in the control, possession, or ownership of the tapes and the pursuit of the misconduct charges against the plaintiffs. Their testimony indicates that they understood these three to be acting as a group. The only evidence which indicated an individual possession pointed to Winchester: he told Osos that the tapes were mailed to him anonymously, (Osos, p. 41), and he handed the transcript to Osos at the meeting, (Osos, p. 39).

thus received and used for deliberation on official union business, and they had an effect. The tapes and transcript provoked official responses by Osos, the International Region director, and the Local which advanced the processing of the Local official's charges. No personal use of the tapes was even suggested.

As indicated above, there is no doubt that this use was undertaken by the Local and International officers to benefit the Unions by enforcing their official policies. There is no evidence that any of the contents on the tape would serve non-union-related or personal business.

Although there was no evidence on who created or caused the creation of the tape and transcript or whether they were created through the use of union assets or instrumentalities, there was more than sufficient evidence that top Local and International officials intentionally used and exercised control over the tapes and transcript for official purposes and that top Local and International officials to establish that the possession and use of the tapes were within the scope of the Local and International officials' authority and duties.

Access to the tapes was not confined, but was actively afforded to the top leaders of the Local and International Region. When the president of a local, the chairman and two members of its bargaining committee, an international's regional director and one of his service representatives meet together to present, consider, and act upon such materials for official purposes, it is the unions that are possessing and using the records. In addition, to the extent that the scope of an organization's agents' authority is determined by the affirmative and passive conduct of the organization's leadership, the Local and International officers in this case, as leaders themselves, were clearly acting within the scope of their authority.

The possible illegal or tortious nature of the recording's use doesn't argue against this finding. Using wiretapped conversations to identify and discipline rule violators is not so inappropriate a means of accomplishing union purposes or so serious a crime as to put it out of the pale of expectable or foreseeable conduct for officials to engage in. *See Restatement (Second) of Agency* § 231 (1958). The actual environment at the Unions confirms our finding. President Fenwick testified that his conversations were secretly recorded "several times" by participants to his conversations who confronted him with the recordings later for business purposes. Fenwick twice went to Osos with such tapes and complained about the practice, asking for one person's removal from his Internationally-appointed position and for "constitutional" (union or federal?) advice regarding another person's taping. According to Fenwick, Osos "disregarded" his complaints and no investigation was undertaken by the International. (Fenwick, pp. 19–25). Apparently it was general knowledge at the Local that tapes of the plaintiffs' conversations existed, yet neither before nor after the meeting did the International, the Local, or any of their officers ever investigate or inquire into the wiretapping even though it was undeniable that union phones had been tapped. At least three officers, Osos, Fenwick, and Flanary, mentioned that they had personal problems with generating or using the tapes, (Flanary, pp. 11–14, 17, 18; Osos, pp. 70–71, 75–76; Fenwick, p.), yet Osos and Fenwick participated in their use and the evidence indicated that at no time did either union direct or ask that corrective action be taken regarding the plaintiffs' tapes specifically or the problem of tapping union phones in general; they did not even investigate or inquire into the scope of the problem. (Fenwick, pp. 31, 36–38, 43–44, 61; Flanary, p. 20). The officer or officers who possessed and promoted the tape at the meeting—Yount, Biggerstaff, and Winchester—indicated their belief, assertedly based on legal advice, that the use of the tapes was not illegal. (Flanary, p. 11; Osos, p. 71). In this permissive environment, it cannot be maintained that officers' use of illegally wiretapped conversations was unexpected or unforeseeable. Even if illegal wiretapping were considered in the abstract to be beyond the scope of an agent's authority, here it was the top union leaders who engaged in acquiring, possessing, and promoting the tapes (the Chairman and two members of the Local's Shop Committee), and higher union leaders (Osos, Elliott, and Fenwick) who ratified their actions by afford-

ing these officers a forum for the use of the tapes, using the tapes and transcript in their official deliberations, initiating some official action because of the tapes, and not taking even cursory corrective or preventative measures.

The plaintiffs have shown that the tapes and transcript were acquired, maintained, and used as official records. We conclude, therefore, that the tapes and transcript constitute official Local records and not personal records of individual Local officers.

2. *Does the Local currently have possession, custody, or control of the tapes and transcript?*

We next examine whether the Local now has possession, custody, or control of these official records. The evidence indicates that three Local officers, Yount, Biggerstaff, and Winchester, exercised physical control of the tapes and transcript at the meeting. Winchester told Flanary and Osos that the tapes were sent to him through the mail[10] and it was Winchester who handed Osos the transcript in the meeting. We have found that the tapes and transcript were official Local records and this evidence indicates that they were in the hands of, and maintained by, top Local officers in the pursuit of official union business. The evidence indicates that the content of the materials was useful for union business and that the top leadership of the Local and International Region enjoyed access to the materials. There is no indication of a loss of the possession or control over the records previously evidenced and there is no evidence of any adverse ownership interest in another person or entity. The Court concludes, therefore, that the Local has possession or custody of the tapes and transcript through its officer or officers who we find were and are acting in their official capacities and we find that the Local has a legal right to obtain possession or custody of these official records.

The plaintiffs motion to compel is granted as to the Local and the Local is ordered to produce all recordings and transcriptions of telephone conversations involving the plaintiffs Kubelsky and McBryar.

B. *The International.*

The International, no less than the Local, acts through its officers. Although there is no evidence that any International officer has ever had possession or physical custody of the tapes and transcript, it is clearly established that Osos, as Director of the International's Region, and Elliott, as his Representative servicing the Local, used the materials in their deliberations on official International business—the discipline of an Internationally-appointed representative—and that Osos took action on the materials by informing the International Department head of the situation and calling for a formal investigation. Though the facts are closer in this case than with the Local, they still tip the balance in favor of finding that the tapes and transcript became official records of the International. Although the evidence indicates that the tapes and transcript left the meeting with the Local officers, there is no indication that the International relinquished its interest in them as official records. The International may be correct that it has no legal power to demand a local's records because they are separate constitutional organizations, but in this case, if Local officers have physical possession or custody of the tapes and transcript, the International would be demanding documents which constitute its own official records as well. The plaintiffs' motion to compel is granted as to the International and the International is ordered to produce all recordings and transcriptions of telephone conversations involving the plaintiffs Kubelsky and McBryar.

*Conclusion.*

The plaintiffs' motion to compel is granted and the International and the Local are ordered to produce all recordings and transcriptions of telephone conversations involving Harold McBryar and Jane Kubelsky within ten days from the date of this Order.

So ORDERED.

---

**10.** Osos also testified that he asked the Local officers at the meeting where the tape came from, and "they" answered that it was received anonymously in the mail.